A. E. KING, Jr., Robert W. King, Individuals, A. E. King, Jr., Trustee of the W. H. Vick Trust, and A. E. King, Jr. and Robert W. King, Co-Trustees of the Edward L. King Trust, Appellees,

v.

SOUTHWESTERN COTTON OIL COMPANY, an Oklahoma Corporation, Appellant.

No. 50234.

Court of Appeals of Oklahoma, Division No. 2.

March 28, 1978.

Rehearing Denied Aug. 25, 1978.

Certiorari Denied Oct. 11, 1978.

Released for Publication by Order of Court of Appeals Oct. 13, 1978.

Charles N. Berry, Jr., Berry & Spooner, Oklahoma City, for appellees.

Judson S. Woodruff, John E. Sargent, Jr., John N. Hermes, McAfee, Taft, Mark, Bond, Rucks & Woodruff, A Professional Corp., Oklahoma City, for appellant.

NEPTUNE, Presiding Judge.

This appeal challenges the trial court's determination of the fair value of dissenting shareholders' stock and its granting of prejudgment interest to the dissidents.

Action was commenced in September of 1971 by minority shareholders of Southwestern Cotton Oil Company (Company) who were owners of 11.26 percent interest in all of the outstanding stock of the Company. The shareholders inherited the stock from their father, A. E. King, Sr.—longtime manager of the Company's mill operation. Initial petitioners were A. E. King, Jr., Robert W. King, Mary Jane Vick, as individuals, and A. E. King, Jr. and Robert W. King as co-trustees of the Edward L. King Trust. Mary Jane Vick died on August 17, 1972 and her interest has been distributed to A. E. King, Jr. Petitioners will be referred to as the Kings.

The remainder of the stock was owned by the Vose family. Charles A. Vose served as president of the Company. The Company was organized in 1901 and operated a cottonseed oil mill and a machine shop engaged in the manufacture of conveyor systems. In 1958 the cottonseed mill operation was terminated but the machine shop continued and the former cottonseed storage facilities were rented to third parties. The Company also engaged in investment activities.

The facts here invoke one of the classic tensions foreknown by the framers of the Oklahoma Business Corporation Act. See McDermott, *Commentary* to the Oklahoma Business Corporation Act, 18 O.S.A.1971 §§ 1.1–1.250. On the one hand, the majority shareholders are given unlimited power via majority rule to change the composition of the enterprise and the rights of its members. On the other hand, the members who dissent from changes are given a right to withdraw their investment at a fair valuation.

The act which initiated Kings' dissenting shareholders' rights was the sale of substan-

tially all of the Company's property to Southwestern Supply & Machine Works, Inc.—a wholly owned subsidiary of the Company. The purpose of this sale was two-fold as expressed in the Company's board of directors' memorandum dated July 1, 1969. The Company "desired to separate its operating business activities from its investment activities in order to insulate and protect its investment assets from the risks and hazards of its business operations." Secondly, the Company's operating business was being managed by a full-time key employee whom the Company wanted to motivate by providing the incentives of stock ownership.

The Company's July 1, 1969 memorandum and sale thereunder was ratified by the board on December 23, 1969 with directors A. E. King, Jr. and Robert W. King objecting. Kings' third amended petition sets forth that the sale was made without the authorization of the Company's shareholders as required by 18 O.S.1971 § 1.164 which governs sales that involve substantially all of a company's property. Kings additionally averred that the transaction was a reorganization of the Company accomplished by the method set forth in 18 O.S.1971 § 1.170a(D) which mandates the vote or written consent of a majority of all shareholders entitled to vote. Kings complained that the Company "avoided submitting this transaction to the shareholders for their approval in order to deprive [them] of their right to dissent from such sale and from such reorganization."

Kings' right to dissent to the Company's corporate action emanates from 18 O.S.1971 § 1.157(b) & (e) which provide:

"b. Any such shareholder shall have the right to dissent to a sale, lease, exchange, or other disposal of all or substantially all of the property and assets of such corporation in the manner provided in [18 O.S. 1971 § 1.164].

. . . . .

"e. Any shareholder of a domestic corporation shall, subject to the provisions of this Act, have the right to dissent to the reorganization of such corporation."

The Kings brought this civil action to determine whether they were entitled to relief, and, if so, for a determination of the fair value of their shares. 18 O.S.1971 § 1.160 c. Title 18 O.S.1971 § 1.159(2) sets forth that "[t]he fair value of such shares shall be the market value thereof as of the day before the vote was taken authorizing such corporate action, excluding any appreciation or depreciation in consequence of such proposed action."

The following pretrial stipulations were made by the parties:

"(1) The facts concerning the directors' meeting of December 23, 1969, are as alleged in plaintiffs' Third Amended Petition and are true and correct. This Court has found that the facts alleged in plaintiffs' Third Amended Petition give rise to dissenting rights in all of the plaintiffs and it is stipulated that the fair value of plaintiffs' stock shall be determined as of December 22, 1969.

"(2) The June 30, 1969, financial statement of defendant shall be used for the purposes of determining the value of plaintiffs' stock as of December 22, 1969, and the June 30, 1969 statement shall be treated for all purposes as if it is the December 22, 1969 statement without adjustments for the period between June 30, 1969 and December 22, 1969, except adjustments to book value shall be made in accordance with plaintiffs' Exhibits 5, 7 and 8.

. . . .."

Because the parties stipulated that Kings were entitled to relief as dissenting shareholders, the principal question for determination by the trial court was to ascertain the value of Kings' stock.

On December 28, 1971 the Company moved to stay proceedings because a minority shareholder, Lois King Campbell, had initiated a shareholder's derivative suit in the United States District Court for the Western District of Oklahoma. One prayer of the petitioner in the federal action, according to the Company, was that the federal court determine the fair market value

of her shares and order the Company to pay her that fair market value. At the January 7, 1972 hearing on the motion, the trial court found "[t]hat the parties hereto have agreed that this action should be stayed pursuant to the Motion to Stay filed by the Defendant herein" and granted a stay of the action. After a final determination in the federal court that ratification of the July 1, 1969 memorandum gave rise to the rights of dissenting shareholders under the Oklahoma statutes, but before final determination on the question of valuation of the minority stock held by Campbell [see *Campbell v. Vose*, 515 F.2d 256 (10th Cir. 1975)], Kings on August 1, 1975 moved to vacate the stay order and the motion was granted.

Trial, without jury, was held August 23, 1976. On September 30, 1976 the court made his findings of fact and conclusions of law and entered judgment for the Kings. The result reached was substantially the following:

"IT IS THEREFORE CONSIDERED ORDERED AND ADJUDGED by the court that the plaintiffs have and recover from the defendant, the sum of $369.36 per share of stock of defendant owned by plaintiffs on December 23, 1969, plus interest thereon at the rate of 6% per annum from December 23, 1969 through September 30, 1976, and thereafter at the rate of 10% per annum until the judgment is satisfied; that the defendant is entitled to an offset of $30.74 per share of stock of defendant owned by plaintiffs on December 23, 1969; that in addition plaintiffs have judgment for expenses in the amount of $3,273.80, plus court costs."

From this adjudication, Company appeals asserting five propositions of error.

## I

Appellant's first complaint of trial error is:

"The trial court erred as a matter of law in determining the fair value of the Kings' shares of stock in the Company."

The trial court determined as a conclusion of law that the formula for determining the value of stock in question is governed by the case of *Foglesong v. Thurston National Life Insurance Co.*, Okl., 555 P.2d 606 (1976). With this conclusion the parties agree. Appellant's assertion is that the trial court misapplied the relevant principles of law set forth in *Foglesong*.

Title 18 O.S.1971 § 1.160 c provides that when the value of the dissenting shareholders' stock cannot be agreed upon and the dissenting shareholders are entitled to and do seek relief from the court, then "the court shall determine the fair value of said shares." Title 18 O.S.1971 § 1.159(2) gives guidance in clarifying the term fair value as follows: "The fair value of such shares shall be the market value thereof as of the day before the vote was taken authorizing such corporate action, excluding any appreciation or depreciation . . . ." Further pilotage to the courts from the legislature for determination of fair value of dissenting shareholders' shares is not provided for in the Business Corporation Act, *supra*.

Judicial edict as enunciated by the Oklahoma Supreme Court in *Foglesong* provides the necessary guidance.

"In the absence of a regular market in the shares or a recognized exchange and of available market quotations or stock price listing as suggested by 18 O.S.1971 § 1.159(2) to determine the fair value of the shares, the courts have been almost unanimous in using a combination of three principal methods of valuation: (1) net asset value; (2) market value, and (3) investment or earnings value. *The three elements of value must be weighted in such proportions as to reasonably reflect the importance and reliability of each to the final determination of fair value.*" (emphasis ours)

Relying upon *In re Watt & Shand*, 452 Pa. 287, 304 A.2d 694 (1973), the court provides the following definitions for the three methods of valuation.

"*Net Asset Value* is the share which the stock represents in the value of the net assets of the corporation. Such assets include every kind of property and value, whether realty or personalty, tangible or intangible, including good will and the corporation's value as a going concern.

"*Investment Value* is an estimate of present worth in light of past, present and prospective financial records of the company and is obtained by capitalizing earnings. There are two basic steps in the capitalization process: calculation of a representative annual earnings figure, and choice of a capitalization ratio which reflects the stability and predictability of earnings of the particular corporation. "*Market Value* refers to the price at which the stock was selling on the market prior to the action which is objected to, disregarding any change in price due to the action." (emphasis in original)

Once the court has before it the values given to the stock determined from the above three principal methods of valuation, these values are then assigned a weight by the court so "as to reasonably reflect the importance and reliability of each to the final determination of fair value." The ultimate goal of the trial court is the determination of the fair value of the dissenting shareholders' stock at the date certain.

■ The trial court must weigh the evidence before it to arrive at the weight to be assigned to the three different methods of arriving at a fair value determination. The supreme court in *Foglesong,* citing *Tome Land & Improvement Co. v. Silva,* 83 N.M. 549, 494 P.2d 962 (1972), enumerated certain factors traditionally considered by courts when apportioning weight among the three methods of valuation—market value, investment value, and net asset value. Listed factors for consideration are the nature of the corporation, market demand for the stock, the business of the corporation, earnings, net assets, general economic conditions, market prices of comparable companies, market price and earnings ratio, management and its policies, reserves for various contingencies, tax liabilities, and future earnings. While this list is not exhaustive it is valuable from a historical perspective to aid the trial court in his determination of the weight to be assigned to each of the three values in order to determine the final "fair value" to be placed on the dissenting stock.

In the case at bar jury was waived and the trial court assigned a weight of 100 percent to the value obtained from the net asset method of valuation. The question for review is whether the trial court committed error by assigning a weight of ˈ00 percent to the net asset value in order to ascertain a fair value figure of $369.36 per share.

■ We will review the record to determine if there is competent evidence to support the trial court's finding. In an action of legal cognizance judgment will not be disturbed on appeal if there is any competent evidence to support it. *Oklahoma Tax Comm'n v. Southwestern Bell Tel. Co.,* Okl., 396 P.2d 500 (1964).

To aid in arriving at the December 22, 1969 fair value of appellees' stock the parties stipulated that the June 30, 1969 financial statement would be treated as if it were the December 22, 1969 statement. The only adjustments to be made for the period between June 30, 1969 and December 22, 1969 were the insertions of those values obtained from qualified appraisers pursuant to their respective appraisals of mineral interests, real estate, and equipment. The trial judge additionally allowed adjustments to be made to the value of appellant's securities during this intervening period.

Both parties offered their evidence of net asset value by way of expert testimony. Appellees' expert was Dr. Robert A. Ford, holder of a Ph. D. in finance, accounting and economics from the University of Alabama and a 14-year professor of finance at the University of Oklahoma. In determining net asset value Dr. Ford started with the June 30, 1969 book value of the company, $1,436,960, and added the following upward adjustments totalling $374,590: (a) real estate—$233,553, (b) mineral interests —$22,500, (c) equipment—$60,032, and (d) securities—$158,505. This resulted in a total net asset value on December 22, 1969 equal to $1,811,550. When divided by the number of appellant's outstanding shares on that date, 4,899, the value per share was

testified to as being $369.69.[1] The parties later stipulated that this value should be $369.37. Dr. Ford also testified that in order to determine the fair value of the company as of December 22, 1969, he would assign a weight of 100 percent to the net asset value.

In regard to investment (or earnings) value, Dr. Ford utilized an annual earnings figure averaged over the five-year period prior to the date of valuation. This average figure amounted to $44,857.20 earnings per year. Using a capitalization rate of twelve and one-half percent to capitalize earnings and then dividing the figure reached by the total number of outstanding shares on December 22, 1969, he was able to ascertain an investment value per share of $114.45.

Dr. Ford took the position that under the facts and circumstances of this case investment value should have no weight in determining the stock's fair value and accordingly assigned it a zero percent weight. He stated: "[E]arnings were not an important factor as far as management of the company was concerned and [the earnings figures over the five-year period] certainly were not reliable." In determining the weight of zero percent to be applied to investment value, Dr. Ford further testified:

"If in looking at the history of this company during this time period it becomes evident that the creation of earnings was not the primary motive for the existence of the company, in examining the portfolio which they held, this is not the type of portfolio that one would buy in order to produce income. It's designed primarily for capital gain rather than for a flow of income. In addition to that, of course you have various assets of the company but in addition to that you have the problem of what appeared to be, at least the conclusion that I came to, that the company not only was not attempting to make earnings but in reality it was doing certain things to keep from doing this"

Such testimony attacks the reliability of using the investment value method in order to determine the fair value of the Company's stock.

In regard to determination of market value, competent evidence is lacking. Dr. Ford testified: "I could find no evidence of market value, no thin market of any kind, no way to reconstruct market value and so I gave it a *value* of zero." (emphasis ours) Because no value existed, Dr. Ford assigned a *weight* of zero to the market value.

■ Appellant submits in its brief that the trial court erred in excluding testimony from Scott Davis, accountant for the majority shareholders. By its offer of proof appellant wanted to show that the Internal Revenue Service had agreed with the estate of Lyda Vose on a fair value and determined the net asset value of her stock in the Company. Such a determination, apparently made for estate tax purposes, resulted in figures representing the stock's value on December, 1971. The proffered values were (1) a net asset value of $333 per share, and (2) a fair value of $250 per share. Appellant asserts this fair value figure should be considered as a reconstructed market value. We cannot agree and feel the trial court rightfully excluded the testimony. In the event no active market exists, credence should be given to a reconstructed market value if one can be made. *Brown v. Hedahl's-QB&R, Inc.*, N.D., 185 N.W.2d 249 (1971). Nevertheless, in the instant case a reconstructed market value is not viable because (a) apparently there had been no exchange of shares, (b) the date of the I.R.S. valuation was for a date certain two years later than the date in question, (c) the proffered valuation was made for an entirely different purpose (estate tax agreement) than the purpose at bar (value of dissenting shareholders' shares), and (d) fair value is not necessarily synonymous to market value. The court was justified in directing a zero percent weight to market value because absent from the evidence was any competent market value to which a weight could be assigned.

---

1. Correct quotient is $369.78.

In ascertaining a fair value figure, Dr. Ford testified he considered all three methods of valuation and then assigned a weight to each dependent upon their importance and reliability. The trial judge, relying on Dr. Ford's analysis, likewise considered all three methods of valuation to achieve his ultimate goal of determining the fair value of the dissenting shareholders' stock on December 22, 1969. Inclusive in the findings of fact is his separation of earnings, market, and net asset methods of valuation:

"That there was no effort to have earnings, and in fact, the earnings of the defendant were insignificant.

"That no stock was sold in an arms length transaction which could be considered in arriving at the fair value of the stock as of December 22, 1969.

"That the only remaining factor which can be considered in evaluating the stock as of December 22, 1969, is the net asset value. That by reason thereof in determining the fair value, the Court finds that net asset value must be given 100% weight."

The question of what weight the trial court should assign the various methods of valuation is purely one of judgment left to the prudent discretion of the trial judge. All methods of valuation need not always be considered. There is no definitive formula which when used in computer-like manner results in a magical equation for fair value determination—nor should there be. The surrounding circumstances in each case differ. A case-by-case approach is indispensable. It is the office of the trial judge to sensibly review the many factors having a bearing on the weight apportioned among the principal methods of valuation in order to arrive at the stock's fair value. Factors paramount to the question of weight in the instant controversy are: (a) the lack of any transfer of shares in this closely held corporation; (b) a poor earnings history brought about by management's goals and policies—to limit the minority interest to a value influenced by poor earnings would be unfair to appellees especially in light of our statutory scheme to protect the minority shareholders from cer-

tain acts by the majority; (c) a company goal primarily devoted to the possession of assets for appreciation rather than earnings; (d) a large holding of highly liquid assets with the majority of assets being securities; and (e) a principal involvement in investment activities rather than manufacturing and commercial enterprises. Such factors are supportive of the trial court's assignment of weight to the net asset method of valuation in order to place a fair value on the shares.

We find no misapplication of the law as set forth in *Foglesong*. In considering the three elements of value, the trial court weighed each in such proportions as to reasonably reflect the importance and reliability of each to the final determination of fair value. The fair value obtained by the trial court is supported by competent evidence. A 100 percent weight assigned to net asset value is reasonable.

Under the circumstances of this case, the finding of the trial court as to fair value of the stock is a correct application of the law, reasonable, and supported by competent evidence. We will not disturb the trial court's conclusion.

## II

Appellant secondly asserts:

"The trial court erred in failing to adjust the appraised value of the Company's assets to appraised value not being fully deductible for income tax purposes."

Appellant argues its witness, being a certified public accountant, was the only witness qualified on the computation of net asset value, and therefore his testimony as to a downward adjustment to net asset value, based on a "writing up" of appellant's assets thus making these assets less valuable from a tax standpoint, requires such an adjustment to be made. We disagree that appellant's witness was the only one qualified.

Qualification of a witness in respect to knowledge and special circumstances rests largely in the trial court's discretion. *Small v. Comer*, 171 Okl. 418, 43 P.2d 716 (1935). Unless the exercise of that discretion is abused, we will not disturb it.

The trial court here again relied on Dr. Ford's testimony and found him qualified to express an expert opinion in the accounting field. Dr. Ford pursued accounting as a major area of study in obtaining his Ph. D. The trial court's acceptance of the witness' qualifications was not an abuse of discretion.

■ Dr. Ford's testimony is persuasive. Two separate and distinct accounting aspects are involved—financial accounting and tax accounting. Each has a purpose different from the other—one is for financial accounting purposes, the other for tax reasons. Although each is a suitable measure for its purpose, each requires different calculations in arriving at a net asset value, and each results in a different value being obtained. The testimony of Dr. Ford was competent to support the trial court's finding on the value obtained under the net asset method of valuation.

### III

Appellant's third proposition of error challenges the sufficiency of the evidence:

> "There was insufficient evidence at trial to support the court's finding that (1) Charles A. Vose used the company to aid other family members and other businesses which were family owned, (2) by the action of Charles A. Vose the Company was used as a holding company and (3) there was no effort to have earnings and, in fact, the earnings were insignificant."

Appellant, under this proposition, launches a tripartite attack against the trial court's "Finding of Fact No. 4." Assailed portions of the court's finding are as follows:

> "That Charles A. Vose used the defendant corporation to aid other family members and other businesses which were family owned.
> "That by the actions of Charles A. Vose, the defendant corporation was used as a holding company.
> "That there was no effort to have earnings and, in fact, the earnings of defendant were insignificant."

■ Appellant's first offensive is based upon the assumption that "the trial court apparently found that the majority had wronged minority by keeping earnings low" and such was not an issue before the court. This charge is parried by the purpose for which appellees' evidence relevant to loans made by appellant to related entities was admitted. The admission was "just for the limited purpose of considering it as to the weight which the court will in the final analysis give to the earnings factor." As mentioned before, the question of weight to be assigned to the earnings (investment) method of valuation is a question of judgment for the trial court. The mentioned evidence was relevant and sufficient for that limited purpose of aiding the trial court in determining the weight to be assigned to the investment value evidence introduced.

■ Appellant next challenges the sufficiency of the evidence determining that appellant was used as a holding company. The record yields sufficient evidence, premised upon appellees' exhibits 3 and 17, for inferences to support such finding. A finding of fact may be based on reasonable inferences fairly drawn from facts in question. *In re Brown*, 412 F.Supp. 1066 (W.D. Okl.1975). Again, the purpose for such a finding goes to the weight placed by the trial court upon the investment method of valuation—the philosophy of appellant concerning earnings, whether aggressive or passive is a factor requisite to apportioning weight.

■ Appellant's final assault propounds "there was no evidence offered that the Company did not attempt to have earnings." It fails for the same reasons as the first two charges. Evidence was sufficient from Dr. Ford's testimony. Once again, such evidence concerns the weight to be applied to the investment method of valuation, a consideration relevant to the determination of the fair value of appellees' stock. Supportive of turning back appellant's final assertion is the finding of the United States Court of Appeals in the case of *Vose v. Campbell*, mentioned earlier, wherein the court expresses similar sentiments based on the same factual occurrence:

"The record demonstrates that the majority stockholders, and the president, directed the corporate investments and activities with a view to capital appreciation and not current income."

Appellant's third proposition is not persuasive.

## IV

Appellant fourthly asserts:

"The trial court erred in finding that the per share value of the Company's stock was $369.36 when the Kings' prayer was for $357.83 per share."

 With appellant's contention we cannot agree. Unless there is material variance, the court's decision should be based on the evidence rather than upon a party's prediction of proof. In the instant case, the variance is not material because appellant has not shown itself to have been misled to its prejudice. 12 O.S.1971 § 311. Therefore, the pleadings will be considered to have been amended to as to conform to the proof. *Liberty Plan Co. v. Francis T. Smith Lumber Co.*, Okl., 360 P.2d 500 (1961).

## V

Appellant lastly attacks the prejudgment interest award from December 23, 1969, the date dissenting shareholder rights arose, to September 30, 1976, the date of judgment. Appellant lodges its attack under the following proposition:

"The trial court erred in finding that the Kings were entitled to prejudgment interest; the Oklahoma appraisal statutes, which are exclusive do not provide for prejudgment interest, nor does the common law; nor do the facts herein justify it."

 The parties stipulated that the facts concerning the December 23, 1969 directors' meeting as alleged in appellees' third amended petition control. Because of these alleged actions by the board of directors, the parties in essence stipulated that this action arises out of the dissenting shareholders provisions of the Business Corporation Act and the court at the onset of trial so held. The Act contains no provisions for the award of prejudgment inter-

est, and if, as the parties apparently stipulated, the Act controls, then no prejudgment interest should be awarded. Where the statute does not provide for interest, is the court without power to award it? We find no Oklahoma cases on this issue, but foreign jurisdictions have denied prejudgment interest, one of which was decided on the basis of the exclusivity of the dissenting shareholder's appraisal statutes. *Meade v. Pacific Gamble Robinson Co.*, 30 Del.Ch. 509, 58 A.2d 415 (1948).

Appellees argue that this case is removable from the statutory umbrella because appellant "illegally" denied appellees their dissenting rights by not following the provisions of the Act in regard to sale of its assets and reorganization, and thus they have been damaged. As a result of this damage, appellees contend they should be entitled to interest upon these damages under the provisions of the general damages statutes—namely 23 O.S.1971 § 6. Section 6 provides:

"Any person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt."

 Assuming, arguendo, that the Act does not control, damage resulted to appellees, and general damages statutes are applicable, as appellees propound, their contentions are still without merit because their claim is unliquidated. Interest is allowed by law prior to judgment only where the amount recoverable is liquidated, not unliquidated. *Champlin Refinery Co. v. Phillips Petroleum Co.*, Okl., 269 P.2d 993 (1954). Title 23 O.S.1971 § 6 necessitates prejudgment interest only where the damages sought are "certain, or capable of being made certain by calculation . . . ."—this being the same as liquidated. Interest cannot be recovered upon an unliquidated claim where a trial is necessary in order to ascertain the amount due. *Smith v. Owens*, Okl., 397 P.2d 673 (1965); *Allison v. Allen*, Okl., 326 P.2d 1059 (1958).

In the present case, before the court could decide the fair value of the stock pursuant to 18 O.S.1971 § 1.160 c, disputed evidence relating to different methods of valuation via expert testimony had to be weighed, and appraisal testimony assessed. The amount of the claim was unliquidated and therefore prejudgment interest could not be allowed.

On the basis of the foregoing, we need not consider appellees' counter-proposition II and counter-proposition III requesting prejudgment interest on the basis of 23 O.S.1971 § 7 and 23 O.S.1971 § 22 respectively.

The trial court's judgment is therefore modified by deleting the allowance of prejudgment interest.

## VI

Appellees' cross-petition in error asserts the following:

"Trial court erred in requiring the Kings to give the Company offset for dividends received since December 22, 1969."

In paragraph five of their third amended petition appellees brought this action seeking fair valuation of their dissenting shares "under the terms of Title 18 O.S. § 1.159." As holders of dissenting shares, they are entitled "to have all the rights and privileges incident to their shares, except as expressly limited by this Section, until such time as the fair value of such shares be agreed upon or determined by judgment." 18 O.S.1971 § 1.161 a. However, 18 O.S. 1971 § 1.161 b imposes the following limitation:

"Cash dividends paid by such corporation upon the dissenting shares after the day on which the vote was taken and prior to payment for such shares by the corporation shall be credited upon the total amount to be paid by the corporation therefor. Any share dividends declared after the shares become dissenting shares shall be treated as part of the dissenting shares and no additional compensation shall be allowed therefor."

The above section purports that once the dissenting shareholders' stock obtains the status of "dissenting shares," the dissenting shareholders are no longer entitled to cash dividends or additional compensation for share dividends incident to their dissenting shares arising after such status results. Here appellees' stock became dissenting shares to which dissenting rights attached on December 23, 1969—as stipulated by the parties. Appellees cannot invoke the broad protective provisions of the Oklahoma Business Corporations Act and ignore the necessary limitations that the Act and fairness require. The trial court correctly offset $30.74 per share for cash dividends paid by appellant after appellees' stock became dissenting shares.

The judgment appealed from is affirmed except as to the allowance of prejudgment interest.

Affirmed as modified.

BACON and BRIGHTMIRE, JJ., concur.