## O'Connor Appeal.

Argued November 9, 1972. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*James P. Coho,* for appellant.

*Raymond W. Midgett, Jr.,* with him *Kenneth W. Gemmill, John I. Hartman, Jr., Dechert, Price & Rhoads,* and *Windolph, Burkholder & Hartman,* for appellee.

OPINION BY MR. JUSTICE EAGEN, May 4, 1973:

Appellant, Laura Watt O'Connor, is the owner of 813 shares of common stock of Watt & Shand, a Pennsylvania corporation, which operates department stores in Lancaster. At the corporation's annual meeting on April 24, 1969, the majority shareholders amended the articles of incorporation to eliminate cumulative voting. Mrs. O'Connor dissented from the plan and in accordance with the Act of May 5, 1933, P. L. 364, §515, as amended, 15 P.S. §1515[1] demanded the fair value payment of her shares of stock.

---

[1] Subsection (A) of §515 gives the following summary of the purposes of the statute: "If any shareholder of a business corporation objects to any proposed plan of action of such corporation authorized under any section of this act, and such section provides that such shareholders shall be entitled to the rights and remedies of dissenting shareholders, such shareholders shall be entitled to the following rights and remedies."

Dissenter's rights were instantly provided by the Act of July 20, 1968, P. L. 459, §43, 15 P.S. §1810 which provides in part: "If any amendment to the articles shall . . . eliminate cumulative voting for directors . . . the holder of any outstanding shares the . . . cumulative voting rights of which are so cancelled . . . shall be entitled to the rights and remedies of dissenting shareholders . . . ."

Subsection (B) of §515 provides in part: "If any shareholder of a business corporation shall file with such corporation, prior to the commencement of the voting by shareholders upon the plan at the meeting of shareholders at which a plan is submitted to a vote,

Watt & Shand offered to pay appellant $93.46 per share which was refused.[2] The corporation then petitioned the Court of Common Pleas of Lancaster County to determine the fair value of appellant's stock. Exercising its prerogative under the statute,[3] the trial court appointed an appraiser to receive evidence and make a recommendation concerning the fair value of the stock. At the close of hearings, the appraiser recommended appellant be paid $84.56 per share. The trial court dismissed appellant's exceptions and adopted the findings of the appraiser. On appeal we vacated the judgment and remanded for a new determination of fair value because the court's acceptance of the appraiser's recommendation was not supported by competent and substantial evidence, which, incidentally, is the compass of our review. *O'Connor Appeal*, 444 Pa. 206, 283 A. 2d 279 (1971).

On remand, counsel for both parties agreed the new determination of fair value should be decided upon the

a written objection to such plan, and shall not vote in favor thereof, and such shareholder, within twenty days after the date on which the vote approving the plan was taken, shall also make written demand on the corporation . . . for the payment of the fair value of his shares, such corporation shall pay to such shareholder the fair value of his shares as of the day prior to the date on which the vote was taken without regard to any depreciation or appreciation thereof in consequence of the plan . . . ."

Thus, what is presently at issue is the value of these shares on April 23, 1969. It is unquestioned that Mrs. O'Connor pursued her claim with procedural precision.

[2] Subsection (B) of §515 provides in part: "Within thirty days after such plan became effective, the corporation . . . shall give written notice thereof to each dissenting shareholder who has made demand as herein provided, and shall make a written offer to each such shareholder to pay for such shares at a specified price deemed by such corporation to be the fair value thereof . . . ."

[3] Subsection (F) of §515 provides in part: "The court may, if it so elects, appoint one or more persons as appraisers to receive evidence and recommend a decision on the question of fair value."

record previously made. On May 23, 1972, the trial court, without appointing an appraiser, found the fair value to be $102.15 per share and entered judgment for appellant in the amount of $83,047.95, without interest, but with costs (other than all fees and expenses of counsel and expert witnesses) to be paid equally by the parties.[4]

Two contentions are advanced by this appeal: (1) the trial court again failed to make a proper determination of fair value, and (2) error was committed in refusing to award interest and in failing to impose all costs on the corporation.

For the reasons hereinafter discussed, we remand the case to the trial court for further consideration.

Preliminarily it should be observed that while the term "fair value" is hardly self-executing in its clarity, the object of an appraisal proceeding is to determine the value of the dissenter's shares on a going concern basis. *Lowry v. General Waterworks Corp.*, 26 Pa. D. & C. 2d 154, 159 (1961) ; *Austin v. City Stores Co. (No. 1)*, 89 Pa. D. & C. 57 (1953).[5] In determining what

---

[4] In its original opinion the lower court provided for the apportioning of costs, but made no mention of interest. On May 30, 1972, a supplemental order was entered pertinently declaring: ". . . the Court reaffirms the judgment as entered without interest, interest having been considered and rejected by the Court at the time the original judgment was entered and the Court further reaffirms the disposition of costs in said judgment since fees and expenses of counsel for and experts employed by any party are specifically excluded by the Business Corporation Law except under certain conditions not here existing."

[5] See also *Tri-Continental Corp. v. Battye*, 31 Del. Ch. 523, 74 A. 2d 71 (1950).

In Note, Shareholders: Appraisal Rights: Compensation to Shareholders Dissenting From Mergers and Consolidations, 40 Calif. L. Rev. 140, 142-43 (1952) it was observed:

"Although courts have long been faced with the problem in many differing situations they have been unable to set out clearly what value means, practically or philosophically.

. . . ."

figure represents this true or intrinsic value, consideration must be given to all factors and elements which reasonably might enter into the fixing of value. As the late Judge ALESSANDRONI wrote in *Austin v. City Stores Co. (No. 1)*, supra, at p. 59: "Some of the factors that must be considered in rendering an intelligent decision are: Asset value; market value; market prices of comparable companies; market price and earnings ratio; management and its policies; earnings; dividends; valuation of assets; reserves for various contingencies; tax liabilities; future earnings; predictions of future business events and etc. The list seems interminable and yet all factors must be considered and given their proper weight in order that a just result might be attained."

In an attempt to render the unwieldy, wieldable, courts have distilled all of these factors into three principal methods of valuation which have been variably used, commonly in combination, in the actual judicial determination of intrinsic value: (1) net asset value; (2) actual market value;[6] and (3) investment value.[7]

"Some difficulty may be due to a conceptual failure to understand the nature of the share to be valued. A shareholder does not own a pro rata share in the corporation's assets except upon dissolution; other than his right to participate in management, his only right of value is his right to share in earnings as distributed. Essentially what is being valued is a right to share the future returns of a going concern."

[6] This case presents an instance where a certain method of valuation has no applicability whatever. Watt & Shand is a closely-held family corporation having unlisted stock and therefore, no public market. Shares are sold too infrequently for market value to play any part in these proceedings, a fact correctly realized by the lower court.

[7] *Net Asset Value* is the share which the stock represents in the value of the net assets of the corporation. Such assets include every kind of property and value, whether realty or personalty, tangible or intangible, including good will and the corporation's value as a going concern.

Upon remand the trial judge undertook to conduct the appraisal as was his right. His opinion indicates that while he studied closely the valuations of the respective experts who testified, he did not choose to adopt either conclusion, opting instead to work out his own valuation.[8] By taking the annual earnings of $11.35, multiplied by 10, or $113.50 less a 10% discount, the trial judge reached a fair value figure of $102.15.

Appellant asserts the court's price earnings ratio is incorrect, claiming that the earnings per share for the year ended January 1969 were $12.93 and not $11.35.[9]

*Investment Value* is an estimate of present worth in light of past, present and prospective financial records of the company and is obtained by capitalizing earnings. There are two basic steps in the capitalization process: calculation of a representative annual earnings figure, and choice of a capitalization ratio which reflects the stability and predictability of earnings of the particular corporation.

*Market Value* refers to the price at which the stock was selling on the market prior to the action which is objected to, disregarding any change in price due to the action.

[8] Appellant's expert, Fitzpatrick, found the fair value of each share to be $145.00. He arrived at this figure by multiplying the diluted earnings per share for the year ended January, 1969 of $11.35 by 15 which obtained a figure of $170.35. Then, because the stock was not freely traded, he discounted it to $145 per share (a discount of approximately 14.7%).

Watt & Shand's expert, Castle, multiplied $11.35 by 10 and from the resulting $113.50 applied a 25% discount, thus reaching a final valuation of $85.13 per share.

[9] The experts *for both sides* used the $11.35 earnings figure in their computations. This diluted earnings figure was obtained by subtracting $.55 (a debenture reserve) from $11.90, the stated earnings figure. The exhibit entitled "Watt & Shand and Hager & Bro., Inc. Pro Forma Combined Statement of Income for the Year Ended January 25, 1969," does indeed list earnings per share as $12.93. It should be pointed out that on May 31, 1968, Watt & Shand acquired all outstanding stock of Hager & Bro., a rival Lancaster department store.

Appellant apparently does not realize that use of $11.35 inures to her ultimate benefit, else she would not press this claim.

The lower court used but a single year (the year ended January 1969) to obtain the average earnings of Watt & Shand. In our judgment this was error, but since neither party complains of the action, we will not review it.

However, we do point out that in this kind of proceeding "[i]t is best to average earnings over several years to avoid undue emphasis on one exceptionally good or bad recent year." Note, Valuation of Dissenters' Stock under Appraisal Statutes, 79 Harv. L. Rev. 1453, 1464 (1966). The purpose of any average is to balance off extraordinary profits against extraordinary losses, in order that a hypothetical figure of what might be considered the ordinary profit or inherent earning capacity of the business may become discernible.[10]

---

[10] In his treatise, Financial Policy of Corporations (5th ed. 1953), Prof. Dewing notes that a period of five years is frequently used, although he goes on to explain at p. 376 that: "There is no mystical significance in taking a ten—or a five—, or a three-year average of earnings to get a more accurate picture of the fundamental earning capacity of the business than is given by the earnings of a single year; and there is no reason why one period should be used for all businesses. It must, however, to use the words of a legal decision, be broad enough to '. . . cover a sufficient period to show the settled condition of things.'" See also Volume 1, Bonbright, Valuation of Property, p. 253 (1st ed. 1937), where the author states: "There is still an agreement among writers that a capitalization of average earnings over a period of 3 to 5 years (occasionally 10 to 15 years) is preferable in most cases, to a capitalization of the earnings of any single year." While our research disclosed no cases on point in this jurisdiction, the Delaware Chancery Court has held it error to use only the two years prior to appraisal, *Adams v. R. C. Williams & Co.*, 39 Del. Ch. 61, 158 A. 2d 797 (1960), preferring to average at least the five previous years. In *Sporborg v. City of Speciality Stores*, 35 Del. Ch. 560, 123 A. 2d 121 (1956), the appraiser considered only

If the corporation's earnings are computed over five years[11] using $12.93 as the Year I figure, the average obtained is $10.79. If the same operation is performed using $11.90, the five year average is $10.58. The parties and the lower court are wrong in thinking a single year constitutes the average[12] and while appellant may be correct that $12.93 represents the true earnings for the year ended January, 1969, she has nonetheless gained $.56 per share by not disturbing the $11.35 figure.

The capitalization ratio used instantly was ten which we feel is within the range of reason.[13]

the fiscal year immediately preceding the effective date of the merger in arriving at the earnings value to be capitalized. The court found this to be error, saying: "True, the upward trend of this Corporation in the last fiscal year may suggest the likelihood that future earnings may be even greater than those of preceding years. But this does not justify the use of only a single year's earnings." 35 Del. Ch. at 566, 123 A. 2d at 125. Again the five-year period was insisted upon.

[11] The following table lists Watt & Shand's earnings per share for the other years necessary to our computation:

| Year Ended January: | 1968 | 1967 | 1966 | 1965 |
|---|---|---|---|---|
| | $17.13 | $8.32 | $10.75 | $4.81 |

[12] For example, the earnings per share for the year ended January, 1968, were $17.13. However, more than half this amount represented the gain Watt & Shand made on the sale of its parking facilities to the city of Lancaster.

[13] Many courts still look to Dewing's treatise, *The Financial Policy of Corporations*, as a guide to the selection of a multiplier. Therein are described seven common types of businesses and suggested capitalization rates ranging from one to ten times earnings. Dewing assigns a value of ten times the net earnings to "old established businesses with large capital assets and excellent good will" and adds "very few industrial enterprises would come within this category." [p. 390] A value of eight times net earnings (12½%) is assigned to "[b]usinesses, well established, but requiring considerable managerial care. To this category would belong the great number of old, successful industrial businesses—large and small." [p. 390] Dewing's work was last revised in 1953 and in

Appellant also contends that the determination of fair value was incorrect because the lower court placed little or no significance on the net asset or book value of this stock. As the lower court's opinion noted, the book value on January 25, 1969, was $126 per share and when adjusted for an up-to-date appraisal of the real estate became $141.91 per share.

While net asset value must be given significance, especially in situations where there is no reliable market value for the stock, see, *Felder v. Anderson, Clayton & Co.*, 39 Del. Ch. 76, 159 A. 2d 278 (1960), courts must be extremely judicious with respect to the amount of weight assigned this factor. As one authority has pointed out "[t]here is nearly complete agreement that book value does not accurately represent the fair value of the corporate assets." Note, 79 Harv. L. Rev., supra, at 1457. This is so for the reason that the balance sheet usually lists assets at original cost, which may differ greatly from present useable value or the present cost of equivalent assets. Normally, the total assets are worth more than the sum of their parts, because they include qualities useful in the context of a particular business that they would lose if put to different uses. In *Borg. v. International Silver Co.*, 11 F. 2d 147, 152 (2d Cir. 1925), the court cautioned, "The suggestion that the book value of the shares is any measure of their actual value is clearly fallacious. It presupposes, first, that book values can be realized on liquidation, which is practically never the case; and second, that liquidation values are a measure of present values. Every one knows that the value of shares in a commercial or

---

certain situations may be dated, although we feel the ratio used instantly was appropriate and are fortified in this belief by the record testimony concerning the price earnings ratio of Strawbridge and Clothier, a somewhat comparable department store in Philadelphia.

manufacturing company depends chiefly on what they will earn, on which balance sheets throw little light."

In its opinion the lower court expressed reservation about factoring in a discount in this particular case, a reservation which we share because of the opinion's conclusion that "book value is not inflated but very conservatively stated." We feel a more appropriate weight can be given to net assets by not employing a discount in this situation. Hence, the fair market value of the stock is $113.50.

We also conclude the lower court erred in declining to award appellant interest and costs. At one time Pennsylvania law made no provision for the award of interest and our courts uniformly refused to allow it. See, e.g., *Austin v. City Stores Co. (No. 2)*, 89 Pa. D. & C. 75 (1954). In 1959 certain amendments were added to the Corporation Code which rectified this situation.[14]

---

[14] Subsection (G) of §515 provides: "The judgment shall make due allowance for any distribution to the shareholders between the day before the date of the vote on the plan and the date of their demand for the fair value of their shares and for such interest as the court may find to be fair and equitable in all the circumstances."

Subsection (H) of §515 provides as follows: "The costs and expenses of any such proceeding shall be determined by the court and shall be assessed against the corporation, but all or any part of such costs and expenses may be apportioned and assessed as the court may deem equitable against any or all of the dissenting shareholders who are parties to the proceeding to whom the corporation shall have made an offer to pay for the shares if the court shall find that the action of such shareholders in failing to accept such offer was arbitrary or vexatious or not in good faith. Such expenses shall include reasonable compensation for and reasonable expenses of the appraisers but shall exclude the fees and expenses of counsel for and experts employed by any party, but if the fair value of the shares as determined materially exceeds the amount which the corporation offered to pay therefor, or if no offer was made, the court in its discretion may award to any shareholder

We believe the better view, as well as the intent of the statute, is to allow interest as a matter of course in all cases absent the existence of some inequitable situation. "Since the corporation has had the use of the dissenter's money without his consent from the time he demanded appraisal, it seems that interest is justified." Note, 79 Harv. L. Rev., supra, at 1472.

Despite the fact that the lower court declined to make these awards, there was no explicit finding that Mrs. O'Connor's refusal to accept Watt & Shand's offer was arbitrary, vexatious or not in good faith, nor is there a shred of evidence in the record to support such a finding. The difference between the corporation's offer and the trial judge's undiscounted appraisal is $16,292.52. This figure materially exceeds the amount the corporation offered to pay and, therefore, appellant should also receive reasonable expenses for the employment of experts. Appellant further requests reimbursement for attorney's fees but the statute does not permit it.

The wording of 15 P.S. §1515 (H) indicates the lower court upon a hearing will determine the proper rate of interest, as well as the costs and expenses of the proceeding and the compensation for experts employed. We do not wish to indicate any view as to how interest should be computed; undoubtedly, there are several techniques, any one of which could be employed. The problem was considered at length in the case of *Felder v. Anderson, Clayton & Co.*, supra, which may be of some assistance. On the question of costs, guidance can be obtained from *Lowry v. General Water-Works Corp.*, 26 Pa. D. & C. 2d 154 (1961), appeal dismissed, 406 Pa. 152, 177 A. 2d 82 (1962), where the

---

who is a party to the proceeding such sum as the court may determine to be reasonable compensation to any expert or experts employed by the shareholder in the proceeding."

court allowed record costs, fees of expert witnesses and costs of service, but disallowed the cost of copies of the notes of testimony, of multilithing briefs or of photostats, saying that these latter expenses were incurred for the convenience of the plaintiff and were not contemplated by the Corporation Code.[15]

Judgment vacated, and the record is remanded for any further proceeding necessary for the entry of a judgment conforming to this opinion.

Mr. Justice ROBERTS and Mr. Justice NIX concur in the result.

---

[15] We also recommend the *form* of the *Lowry* opinion be followed by the several courts of common pleas in future stock appraisal proceedings. By this we mean that the opinion set forth the appraiser's tables stating the percentage weight assigned to each value factor. One of the more obvious benefits is to simplify the task of review.