Commonwealth of Pennsylvania *v.* Bessemer and Lake Erie Railroad Company, Appellant.

Bessemer and Lake Erie Railroad Company, Appellant *v.* Commonwealth of Pennsylvania, Appellee.

Bessemer and Lake Erie Railroad Company, Appellant *v.* Commonwealth of Pennsylvania, Appellee.

Bessemer and Lake Erie Railroad Company, Appellant *v.* Commonwealth of Pennsylvania, Appellee.

Bessemer and Lake Erie Railroad Company, Appellant *v.* Commonwealth of Pennsylvania, Appellee.

Bessemer and Lake Erie Railroad Company, Appellant *v.* Commonwealth of Pennsylvania, Appellee.

Bessemer and Lake Erie Railroad Company, Appellant *v.* Commonwealth of Pennsylvania, Appellee.

Bessemer and Lake Erie Railroad Company, Appellant *v.* Commonwealth of Pennsylvania, Appellee.

Bessemer and Lake Erie Railroad Company, Petitioner *v.* Commonwealth of Pennsylvania, Respondent.

Bessemer and Lake Erie Railroad Company, Petitioner *v.* Commonwealth of Pennsylvania, Respondent.

Bessemer and Lake Erie Railroad Company, Petitioner *v.* Commonwealth of Pennsylvania, Respondent.

Argued October 7, 1980, before President Judge CRUMLISH and Judges MENCER, ROGERS, MACPHAIL and PALLADINO. Judges WILKINSON, JR., BLATT, CRAIG and WILLIAMS, JR. did not participate. Reargued November 18, 1980, before President Judge CRUMLISH and Judges WILKINSON, JR., ROGERS, BLATT, CRAIG, WILLIAMS, JR. and PALLADINO. Judges MENCER and MACPHAIL did not participate.

*David McNeil Olds,* with him *Carl F. Chronister, Edward T. Baker* and *Donald J. Harrell, Reed, Smith, Shaw & McClay,* for petitioner.

*Eugene J. Anastasio,* Deputy Attorney General, for respondent.

OPINION BY JUDGE CRAIG, March 5, 1981:

Bessemer and Lake Erie Railroad Company (B&LE) has appealed from orders of the Board of Finance and Revenue fixing the value of B&LE's capital stock for Pennsylvania capital stock tax purposes for each of the years 1965 through 1974. The board affirmed, and refused resettlement of, the valuations of the Department of Revenue with the exception of the year 1971, where the board reduced the departmental valuation by $5 million to $70 million. The values thus developed are listed in Table D below.

Governed by Section 1104 of The Fiscal Code[1] (having antedated Pa. R.A.P. 1571), our evidentiary hearings produced a stipulation of the facts in part, which the court hearby adopts as *Finding No. 1,* and additional evidence, from which we will make findings necessary to our decision in the course of this opinion.

The issues are:

1. What is the correct valuation of B&LE's capital stock for capital stock tax purposes for each of the years 1965 through 1974, in accordance with Section 21 of the Act of June 1, 1889, P.L. 420, *as amended,* repealed by the Act of March 4, 1971, P.L. 92, effective immediately, *formerly* 72 P.S. §1871, for the years through 1970 and Section 602 of the Tax Reform Code, Act of March 4, 1971, P.L. 6, *as amended,* 72 P.S. §7602, for the later years?

---

[1] Act of April 9, 1929, P.L. 343, *as amended, formerly* 72 P.S. §1104, repealed in part by the Act of April 28, 1978, P.L. 202, effective June 27, 1978, further repealed by the Act of October 5, 1978, P.L. 1104, suspended absolutely by Pa. R.A.P. 5101(a). The procedure is now governed by Pa. R.A.P. 1571.

2. Is the matter of the Commonwealth's timeliness, in accord with Section 801(b) of The Fiscal Code, 72 P.S. §801(b), in making settlement of the 1967 capital stock tax properly before us and, if so, was that settlement untimely so that the valuation returned by B&LE must be accepted for that year?

## Capital Stock Valuation

Although two statutes govern valuation here, the enumerated criteria to be considered are identical and require this court to determine the

actual value [of the capital stock] in cash . . . ; taking into consideration, first, the average which said stock sold for during the year; and second, the price or value indicated or measured by net earnings or by the amount of profit made and either declared in dividends, expended in betterments, or carried into the surplus or sinking fund; and third, the actual value indicated or measured by consideration of the intrinsic value of its tangible property and assets, and of the value of its good will and franchises and privileges, as indicated by the material results of their exercise, taking also into consideration the amount of its indebtedness.[2]

These factors must be analyzed by us de novo in the light of the particular situation of each case. *Rest Haven-Chestnut Hill, Inc. v. Commonwealth*, 35 Pa. Commonwealth Ct. 115, 385 A.2d 609 (1978); *Chrysel Corp. v. Commonwealth*, 6 Pa. Commonwealth Ct. 368, 295 A.2d 624 (1972). Because no trading in B&LE's stock occurred in any of the years in question, the first criterion is inapplicable here; thus the court can consider only the latter approaches.

[2] Act of June 1, 1889, P.L. 420, *as amended, formerly* 72 P.S. §1902, repealed by the Act of March 4, 1971, P.L. 92, effective immediately; the same language is continued by the Act of March 4, 1971, P.L. 88, *as amended*, 72 P.S. §7601.

The determination of a property's value from the income it produces requires judgment as to the nature of that relationship and ultimately as to its mathematic representation.

Thus the first subordinate question to be resolved, and as to which the parties are in dispute, is what capitalization rate should be applied to B&LE's income data so that the indicated value is a legitimate measure of actual value in cash.

The Commonwealth contends that the rates it employed—with respect to earnings, 10%; with respect to dividends, 8%—are appropriate. However, in support of that proposition, the Commonwealth has offered virtually no evidence other than to present its tradition of using those rates, and conclusory testimony to the effect that its proffered ultimate values are "fair" and are "supported" by capitalization using those rates.

As precedents on the issue, the Commonwealth points us to *Commonwealth v. Rosenbloom Finance Corporation,* 91 Dauph. 359 (1969), and to *O'Connor Appeal,* 452 Pa. 287, 304 A.2d 694 (1973).

In *Rosenbloom,* the Dauphin County court, as this court's predecessor, remarked in a footnote at 91 Dauph. 362, that "[e]arnings are customarily capitalized at 10%, and dividends at 8%." We cannot read that language to bless those rates because capitalization rates were not disputed in that case; the issue there was the taxpayer's argument for more emphasis on the indicated results of capitalization and less on the intrinsic value of its assets, 98% of which were stocks and securities listed on national exchanges, making their values readily obtainable.

In *O'Connor,* the Supreme Court wrote, 452 Pa. at 295, 304 A.2d at 700, that "[t]he capitalization ratio [rate] used instantly was ten [10%] which we feel is within the range of reason." The footnote which ac-

companies that decision makes clear that the court found that rate reasonable because testimony as to the earnings/price ratio of a comparable store supported it and not because of any custom or tradition. That same footnote undermines the Commonwealth's argument that its custom has received the Supreme Court's imprimatur, in that the court refers with some reliance to a treatise on corporate financing propounding that very few businesses would be found for which a capitalization rate of 10% would be appropriate, and that the great number of older successful industrial businesses would more appropriately be valued by capitalizing earnings at 12.5%.

That the courts in those cases articulated and accepted the same rates as the Commonwealth now submits is thus not conclusive; we find those passing references to stand more clearly for the proposition that such rates are not immutable, but must be justified in a given case by economic realities if they are to be used fairly to indicate actual values.[3]

In contrast to the Commonwealth, B&LE has offered persuasive and voluminous evidence that those rates are inappropriate. Its experts, particularly Mr. Schoenwald, explicated in detail the analyses they undertook to derive capitalization rates which are appropriate, in their judgment, in view of the realities of B&LE's position in relation to the railroad industry and the economy as a whole.

Those analyses incorporated several approaches to the question, including study of earnings/price ratios for the railroad industry (giving consideration to the comparability of different railroads to the B&LE),

[3] The Commonwealth points in part to 61 Pa. Code §155.24, which incorporates those rates into the regulations of the Department of Revenue; however, those provisions cannot control the question because they were promulgated in August of 1979. Neither do we find this later institutionalization of those rates to be in any way persuasive of their propriety for the years in question.

study of average earnings/price ratios for industrial businesses generally, and attention to the relative costs of debt financing within the railroad industry and the broader capital market. The testimony indicated that such approaches were essential to determining appropriate rates especially because of the declining attractiveness of railroads as investment opportunities and the resultant capital formation problems of B&LE and the industry as a whole. We agree that those approaches are useful because "each company must be viewed in its particular circumstances." *Rosenbloom, supra,* 91 Dauph. at 362.

We place little weight on the testimony of B&LE's tax officer on this question because it lacked the substantiation of the expert analyses and in some instances used capitalization rates which B&LE's experts, in similar contexts, themselves found unreasonable.

B&LE's experts, other than Mr. Schoenwald, focused their appraisals on only a few years, and derived their indicated rates from narrower data bases. Based on the comprehensive approach employed by Mr. Schoenwald and its greater attention to the myriad of factors which affect the relationship of income and value, we conclude that the ultimate rates propounded by Mr. Schoenwald, as set forth in Table A, are appropriate to use in this analysis with respect to earnings, and we adopt Table A as *Finding No. 2.*

Table A

| Year | Rate (%) |
|------|----------|
| 1965 | 10.50 |
| 1966 | 11.25 |
| 1967 | 11.50 |
| 1968 | 12.00 |
| 1969 | 13.75 |
| 1970 | 14.50 |
| 1971 | 13.75 |

| | |
|---|---|
| 1972 | 13.00 |
| 1973 | 13.75 |
| 1974 | 15.00 |

One point remains to be resolved on this question. Because a business is unlikely to distribute all of its earnings as dividends, dividends generally represent a relatively smaller proportion of the underlying value than earnings do. Therefore, applying the same capitalization rate to earnings and dividends would be clearly inappropriate, because the relationship the rate is to represent is not identical. The Commonwealth recognized the point, at least insofar as it employed the rates of 10% as to earnings and 8% as to dividends.

However, because B&LE and its experts have argued strenuously that B&LE's dividends are too erratic to be a valid indicator of value and should therefore be ignored, they have not addressed the question of the appropriate rates to be applied to B&LE's dividends. Nor has the Commonwealth addressed this question other than by implication from its proffered rates.

Because the statutes require us to consider dividends, and we believe their capitalization to be a legitimate consideration, we adopt for dividends a capitalization rate which recognizes that dividends usually constitute a base smaller than earnings; our approach takes heed of the only evidence on the point, namely the proportionate difference in the Commonwealth's rates. We also conclude that five-year average dividends, when available, should be used in preference to current yearly dividends, to minimize the effect of irregularities in the payment of dividends.

Accordingly, we have determined the following rates to be appropriate in our consideration of dividends as indicators of value, so that the following Table B comprises our *Finding No. 3.*

### Table B

| Year | Rate (%) |
|------|----------|
| 1965 | 8.4 |
| 1966 | 9.0 |
| 1967 | 9.2 |
| 1968 | 9.6 |
| 1969 | 11.0 |
| 1970 | 11.6 |
| 1971 | 11.0 |
| 1972 | 10.4 |
| 1973 | 11.0 |
| 1974 | 12.0 |

The second subordinate question under the earnings and dividends approach is to what measures of earnings those rates should be applied. Three such measures are present in the evidence: B&LE's book earnings, B&LE's earnings as reported to the ICC, and B&LE's ICC earnings as adjusted by Mr. Schoenwald to reflect differences in accounting practices and to compensate for elements of B&LE's earnings which he considered abnormal.

The three substantive adjustments to ICC earnings, in most cases deletions, were in these areas: (1) gains realized from the sale or salvage of World War II vintage equipment which had been subject to accelerated depreciation; (2) gains realized from the reacquisition of B&LE bonds; and (3) income from the rental of freight cars, which income was substantially affected by changes in ICC regulations.

We believe these adjustments are unwarranted for our present purposes. Admittedly, such elements of income might be disregarded by some investors as unlikely to recur, and might also be inappropriate if the relevant determination were that of fair market value.

However, the statute directs us to the "actual value in cash" for the respective tax years, and requires us

to consider earnings; therefore we cannot ignore such substantial revenues of B&LE. Moreover, the non-recurrence of such revenues in future years will be reflected in lower earnings for those future years, with a corresponding lowering effect upon taxable stock value in those later years.

The fourth adjustment attempted to compensate for differences in depreciation accounting between standard and ICC methods. Such an adjustment appears to be unnecessary because book earnings themselves are directly available without resort to such adjustment of ICC earnings.

Moreover, we believe book earnings to be most useful here because the earnings capitalization rates we have adopted were derived from analysis of market information, presumably based on standard accounting methods to provide inter-industry comparability.

We find the most appropriate measure of earnings in this case to be, for each year, B&LE's five-year average book earnings; using averages rather than current figures mitigates fluctuations in year-to-year earnings and thus avoids unreasonable fluctuations in the indicated underlying values, as in the case of our use of five-year average dividends.

Our Table C, below, presents the values indicated by capitalization of B&LE's five-year average book earnings and five-year average dividends at the rates specified in Tables A and B, together with B&LE's book equity for each year.[4] [5] We constitute Table C as our *Finding No. 4.*

---

[4] The equity figures are from balance sheets of B&LE, with the exceptions of 1966, 1967, and 1968, for which years the values have been taken from a Commonwealth exhibit, because it was the only source available; that exhibit provided equity in millions and presumably rounded hundreds of thousands.

[5] B&LE's underlying five-year average book earnings and five-year average dividends are as follows:

## Table C
## ($000's)

| | Capitalized 5-year average Earnings | Capitalized 5-year average Dividends | Book Equity |
|------|------|------|------|
| 1965 | 46,974 | 48,809 | 52,943 |
| 1966 | 55,697 | 57,778 | 54,200 |
| 1967 | 65,051 | 67,391 | 54,500 |
| 1968 | 73,276 | 79,166 | 58,900 |
| 1969 | 65,469 | 64,545 | 62,516 |
| 1970 | 65,185 | 57,069 | 67,103 |
| 1971 | 67,052 | 46,545 | 74,717 |
| 1972 | 65,235 | 40,577 | 75,853 |
| 1973 | 54,269 | 34,909 | 77,077 |
| 1974 | 52,819 | 35,833 | 80,916 |

The statutes further require that we consider the intrinsic value of B&LE's property and assets and its indebtedness. Although B&LE's book equity cannot be said to be an exact measure of that net value, it is a valid indicator, particularly because it exhibits a consistent pattern of growth over the years in question.

That growth is to us significant in view of the testimony that B&LE's dividend payments appear to be secondary to its need to retain earnings for capital

| | 5-year Average Book Earnings | 5-year Average Dividends |
|------|------|------|
| 1965 | 4,932,300 | 4,099,976 |
| 1966 | 6,265,934 | 5,199,976 |
| 1967 | 7,480,919 | 6,199,976 |
| 1968 | 8,793,079 | 7,599,976 |
| 1969 | 9,002,026 | 7,099,976 |
| 1970 | 9,451,840 | 6,619,976 |
| 1971 | 9,219,586 | 5,119,976 |
| 1972 | 8,480,530 | 4,219,976 |
| 1973 | 7,461,998 | 3,839,976 |
| 1974 | 7,922,914 | 4,299,976 |

purposes. Because of the capital formation problems faced by the railroad industry over the years in question, B&LE's ability to alleviate those difficulties by retaining earnings while still paying substantial dividends, and to increase its equity contemporaneously, is an indication of the company's health, even if attributable only to conscientious management.

We find averaging B&LE's book equity with the above indicated results of capitalization to be more reasonable as a method of considering intrinsic value here than any rule-of-thumb discounting of that value or the speculative approaches to the issue offered by B&LE's witnesses.

Table D, below, provides the range of values offered by B&LE's witnesses and the Commonwealth's suggested values, for comparison with the three-way average of the indicated values from Table C and B&LE's book equity.

As noted above, the Commonwealth's evidence was primarily conclusory testimony that its submitted values were fair and "supported" by capitalization at 10% and 8%. As the Commonwealth pointed out, the values indicated when those rates are used, and averages of those values by several methods, are with few exceptions substantially higher than the Commonwealth's ultimate valuations. However, the Commonwealth has never addressed this disparity between the results of its analysis and its submitted values, and we cannot find such unexplained magnanimity to be supportive of the Commonwealth's proffered values.

We determine the actual value in cash of B&LE's capital stock, for each of the years in question, by adopting three-way average values, derived from our previous findings. Our determinations are set forth in the right-most column of Table D headed "Final Value", with the exception only of the value provided with respect to the year 1967 which, as will immedi-

ately follow, we find to be $42,500,000.00, as originally reported by B&LE. Table D, with the exception of the 1967 Final Value, constitutes our *Finding No. 5.*

Table D
($000's)

|  | B&LE | | Commonwealth | Final |
|  | Low | High |  | Value |
|------|--------|--------|--------------|--------|
| 1965 | 39,317 | 39,500 | 45,000 | 49,575 |
| 1966 | 46,809 | 48,000 | 55,000 | 55,892 |
| 1967 | 51,277 | 51,500 | 55,000 | 62,314 |
| 1968 | 52,329 | 54,500 | 65,000 | 70,447 |
| 1969 | 50,000 | 51,074 | 65,000 | 64,177 |
| 1970 | 41,975 | 51,000 | 75,000 | 63,119 |
| 1971 | 48,489 | 51,500 | 70,000 | 62,771 |
| 1972 | 48,000 | 49,802 | 60,000 | 60,555 |
| 1973 | 45,818 | 46,000 | 60,000 | 55,418 |
| 1974 | 45,020 | 49,000 | 60,000 | 56,523 |

TIMELINESS OF 1967 SETTLEMENT

The Fiscal Code, Section 801(b), as applied to 1967 capital stock tax, required the department to make settlement "as far as possible" so that settlement notice would reach B&LE before the end of 1968, and, if that notice is tardy without sufficient excuse, the law makes the amount reported by B&LE for 1967, $42.5 million, conclusive without regard to the Commonwealth's proffered settled value of $55 million. *Commonwealth v. Safe Harbor Water Power Corp.*, 423 Pa. 101, 223 A.2d 223 (1966); *Commonwealth v. Allied Building Credits, Inc.*, 385 Pa. 370, 123 A.2d 686 (1956).

Although B&LE's capital stock tax report for 1967 was due on April 15, 1968, under Section 707 of The Fiscal Code, 72 P.S. §707, B&LE requested and received from the department an extension of time which allowed B&LE to file the report October 14, 1968, six months past the statutory deadline. The department

mailed notice of its settlement to B&LE July 18, 1969, past its Section 801(b) deadline by six-and-a-half months.

After the department denied resettlement, B&LE filed a petition for review with the board in August 1973, and the board's denial is the subject of the appeal filed in this court in February 1974 at No. 236 C.D. 1974, where B&LE, in its petition for review specification of objections, raised the merits of the valuation but not the timeliness of the settlement.

In March 1974, B&LE filed a petition for refund with the board for 1967 raising the settlement's timeliness. The board refused that petition "for lack of jurisdiction since the provisions of Section 503 of The Fiscal Code have not been met." B&LE appealed that action to this court at No. 1212 C.D. 1975, with a specification of objections raising only the timeliness question.

The Commonwealth argues that the timeliness question is not before us for decision because B&LE did not raise it in its review petition and is barred from raising it in the appeal here from the refund petition, citing *Broomall Terrace Co. Inc. v. Commonwealth* (1979) which held that if a review petition is first employed, the refund petition "is unavailable to relitigate the same issue." With respect to the review petition, the Commonwealth reminds us that Fiscal Code §104 prevents us from considering questions not raised in the specifications or the petition itself, and that the petition and specifications cannot be amended to raise settlement timeliness after the appeal time has passed. *Commonwealth v. Sherwin Equipment, Inc.,* 89 Dauph. 330 (1968). As to the refund petition, we gather the Commonwealth's position to be that timeliness cannot be before us if the board was correct in deciding that it had no jurisdiction, in that B&LE must perforce lose that point because its specifications

rest upon settlement timeliness and do not mention jurisdiction.

Section 503(a) of The Fiscal Code, 72 P.S. §503(a), provides that the "jurisdiction of the Board of Finance and Revenue to hear and determine a petition for refund . . . shall not be affected . . . by the fact" that review petition proceedings are pending "provided such [review] proceedings relate to other objections than those raised in the petition for refund. . . ."

Thus Section 503(a) expressly affirms the board's jurisdiction over a refund petition which raises objections beyond those raised in the review petition. Although B&LE apparently filed the refund petition for the purpose of raising the timeliness objection omitted from the review petition, Section 503(a) seems to confer its blessing upon that second chance. Our reading is consistent with *Broomall, supra,* understanding as we do that the objection of timeliness was not embraced within the issue of the merits of the valuation.

Therefore, the board did have jurisdiction of B&LE's refund petition for 1967 tax, and the appeal from the board's dismissal of the petition is before us as a vehicle embodying the timeliness question. Even though the board decision spoke in terms of jurisdiction in relation to Section 503, B&LE's objection here, in reliance on the same section, is sufficient as an appeal from that board decision because Section 503(a), quoted above, equates the "jurisdiction" of the board with its duty to hear "other objections", and B&LE is here obviously appealing from the board's refusal to hear the timeliness objection.

Hence we must consider whether or not the department's delay in making settlement was justified. B&LE demands promptness from the Commonwealth, although not as to itself, in insisting that, after B&LE

sought and received from the Commonwealth an extension of six months for its filing, B&LE's valuation is entitled to prevail because the Commonwealth extended its own settlement time for six-and-one-half months.

By reasonable conjecture, B&LE's extension might well have warranted the Commonwealth's delay of almost equal length, but reasonable conjecture cannot replace the facts on the record. The Commonwealth has offered neither evidence nor claim to explain its delay. Because there is nothing in the record to permit us to conclude that the two-and-one-half months between mid-October and the end of 1968 were insufficient for the Commonwealth's chore, we must decide this issue in favor of B&LE and hold that the 1967 capital stock tax valuation, by mandate of law, is therefore $42.5 million, in accordance with *Safe Harbor, supra,* and that the tax due the Commonwealth for 1967 is $171,091.21, as originally reported by B&LE.

Accordingly, we make the following

### Conclusions of Law

1. The Bessemer and Lake Erie Railroad Company is a Pennsylvania corporation properly subject to capital stock tax liability under the Act of June 1, 1889, P.L. 420, *as amended,* now repealed, and the Act of March 4, 1971, P.L. 6, *as amended,* for the years 1965 through and including 1974.

2. The value of the capital stock of the Bessemer and Lake Erie Railroad Company, for capital stock tax purposes, for the years 1965 through 1974 is as follows:

| | |
|---|---|
| 1965 | $49,575,000 |
| 1966 | $55,892,000 |
| 1967 | $42,500,000 |
| 1968 | $70,447,000 |
| 1969 | $64,177,000 |
| 1970 | $63,119,000 |

| | |
|---|---|
| 1971 | $62,771,000 |
| 1972 | $60,555,000 |
| 1973 | $55,418,000 |
| 1974 | $56,253,000 |

3. The taxable value of the capital stock of the Bessemer and Lake Erie Railroad Company, determined for each year except 1967 by applying the apportionment fractions (set forth in decimal equivalents below) agreed upon by the parties to the above determined capital stock values for each year, is as follows:

| | Apportionment | Taxable Value |
|---|---|---|
| 1965 | .621445 | $30,808,135 |
| 1966 | .506394 | $28,303,373 |
| 1968 | .741632 | $52,245,749 |
| 1969 | .76223 | $48,917,634 |
| 1970 | .735849 | $46,446,053 |
| 1971 | .781178 | $49,035,324 |
| 1972 | .791715 | $47,942,301 |
| 1973 | .78871 | $43,708,730 |
| 1974 | .792334 | $44,571,164 |

4. The capital stock tax of the Bessemer and Lake Erie Railroad Company for the years 1965 through 1974, except 1967, determined by applying the rates provided by law to the above determined taxable values of the capital stock, is as follows:

| | Tax |
|---|---|
| 1965 | $154,040.67 |
| 1966 | $141,516.86 |
| 1968 | $313,474.49 |
| 1969 | $342,423.43 |
| 1970 | $325,122.37 |
| 1971 | $490,353.24 |
| 1972 | $479,423.01 |
| 1973 | $437,087.30 |
| 1974 | $445,711.64 |

5. The capital stock tax of the Bessemer and Lake Erie Railroad Company for the year 1967 is $171,091.21, as originally reported by the taxpayer.

6. Judgment in the amounts set forth in conclusions 4 and 5 above should be entered in favor of the Commonwealth and against the Bessemer and Lake Erie Railroad Company to the docket numbers corresponding to the years in question as follows:

|      | Docket Number            |
|------|--------------------------|
| 1965 | 584 C.D. 1968  (447 T.D. 1970) |
| 1966 | 235 C.D. 1974            |
| 1967 | 1212 C.D. 1975           |
| 1968 | 237 C.D. 1974            |
| 1969 | 238 C.D. 1974            |
| 1970 | 338 C.D. 1974            |
| 1971 | 555 C.D. 1975            |
| 1972 | 1554 C.D. 1979           |
| 1973 | 1556 C.D. 1979           |
| 1974 | 1558 C.D. 1979           |

7. Because the appeal for the year 1967 docketed to No. 1212 C.D. 1975 has been decided in favor of the Bessemer and Lake Erie Railroad Company, its alternative appeal for 1967 docketed to No. 236 C.D. 1974 should be dismissed as moot and judgment should be entered accordingly.

DECREE NISI IN 447 T.D. 1970

AND Now, March 5, 1981, after hearing, it is ordered and decreed that unless exceptions be filed within thirty (30) days of this date, judgment be entered in favor of the Commonwealth and against the Bessemer and Lake Erie Railroad Company in the amount of $154,040.67, together with interest and costs according to law.

### DECREE NISI IN 235 C.D. 1974

AND NOW, March 5, 1981, after hearing, it is ordered and decreed that unless exceptions be filed within thirty (30) days of this date, judgment be entered in favor of the Commonwealth and against the Bessemer and Lake Erie Railroad Company in the amount of $141,516.86, together with interest and costs according to law.

### DECREE NISI IN 1212 C.D. 1975

AND NOW, March 5, 1981, after hearing, it is ordered and decreed that unless exceptions be filed within thirty (30) days of this date, judgment be entered in favor of the Commonwealth and against the Bessemer and Lake Erie Railroad Company in the amount of $171,091.21, together with interest and costs according to law.

### DECREE NISI IN 237 C.D. 1974

AND NOW, March 5, 1981, after hearing, it is ordered and decreed that unless exceptions be filed within thirty (30) days of this date, judgment be entered in favor of the Commonwealth and against the Bessemer and Lake Erie Railroad Company in the amount of $313,474.49, together with interest and costs according to law.

### DECREE NISI IN 238 C.D. 1974

AND NOW, March 5, 1981, after hearing, it is ordered and decreed that unless exceptions be filed within thirty (30) days of this date, judgment be entered in favor of the Commonwealth and against the Bessemer and Lake Erie Railroad Company in the amount of $342,423.43, together with interest and costs according to law.

## Decree Nisi in 338 C.D. 1974

And Now, March 5, 1981, after hearing, it is ordered and decreed that unless exceptions be filed within thirty (30) days of this date, judgment be entered in favor of the Commonwealth and against the Bessemer and Lake Erie Railroad Company in the amount of $325,122.37, together with interest and costs according to law.

## Decree Nisi in 555 C.D. 1975

And Now, March 5, 1981, after hearing, it is ordered and decreed that unless exceptions be filed within thirty (30) days of this date, judgment be entered in favor of the Commonwealth and against the Bessemer and Lake Erie Railroad Company in the amount of $490,353.24, together with interest and costs according to law.

## Decree Nisi in 1554 C.D. 1979

And Now, March 5, 1981, after hearing, it is ordered and decreed that unless exceptions be filed within thirty (30) days of this date, judgment be entered in favor of the Commonwealth and against the Bessemer and Lake Erie Railroad Company in the amount of $479,423.01, together with interest and costs according to law.

## Decree Nisi in 1556 C.D. 1979

And Now, March 5, 1981, after hearing, it is ordered and decreed that unless exceptions be filed within thirty (30) days of this date, judgment be entered in favor of the Commonwealth and against the Bessemer and Lake Erie Railroad Company in the amount of $437,087.30, together with interest and costs according to law.

360

DECREE NISI IN 1558 C.D. 1979

AND Now, March 5, 1981, after hearing, it is ordered and decreed that unless exceptions be filed within thirty (30) days of this date, judgment be entered in favor of the Commonwealth and against the Bessemer and Lake Erie Railroad Company in the amount of $445,711.64, together with interest and costs according to law.

DECREE NISI IN 236 C.D. 1974

AND Now, March 5, 1981, it is hereby ordered and decreed that unless exceptions be filed within thirty (30) days of this date, the above-captioned appeal be dismissed as moot and judgment be entered accordingly.