535 A.2d 86

In re SPANG INDUSTRIES, INC.

APPEAL OF SPANG INDUSTRIES, INC.

Superior Court of Pennsylvania.

Argued April 29, 1987.

Filed Nov. 23, 1987.

Reargument Denied Jan. 7, 1988.

Paul A. Manion, Pittsburgh, for appellant.

Before CIRILLO, President Judge, and MONTEMURO and TAMILIA, JJ.

TAMILIA, Judge:

Appellant Spang Industries, Inc., (Industries), appeals from an Order of the Court of Common Pleas of Butler County which awarded dissenting shareholders a sum of $32.75 per share owned by each dissenter, as well as expert witness fees in the amount of $154,964.25 to Edgar V. Weir.[1]

1. The trial court found Edgar V. Weir, who is a dissenting shareholder in the case before us, is one of the three founders of Magnetics, Inc.,

The appeal before us stems from an action below, pursuant to 15 Pa.S.A. § 1515, filed by Industries to determine the fair value of its stock on January 31, 1983. The following statements are contained in the trial court's findings of fact:

Industries is the successor in interest to Magnetics, Inc., which was founded in 1949 to manufacture and sell magnetic electronic components. On January 31, 1983, Industries was merged into Jethro Acquisition Inc., a wholly owned subsidiary of Spang & Co., pursuant to an Agreement and Plan of Merger dated November 16, 1982. Jethro Acquisition Inc. subsequently was merged with and into Spang & Co. The Plan of Merger was submitted to a vote of the shareholders of Industries at a special meeting properly called, noticed and held on January 31, 1983. The Plan of Merger was approved by 2,136,791 shares which constituted 89% of Industries' outstanding shares and 96.4% of the 2,217,435 shares of Industries' outstanding stock voted at the special meeting.

Approximately 90% of the minority shareholders present at the special meeting (i.e., 718 out of 811) voted in favor of the merger. The shares and shareholders eligible to vote at the January 31, 1983 special meeting and the results of the vote are accurately summarized on Industries' Trial Exhibit 34.

Of the minority shares represented at the meeting 34.1% voted against and 65.9% voted in favor of the merger. (P's. Ex. 34)

At the effective time of the merger, each issued and outstanding share of common stock par value $1.00 per share, of Industries, other than shares held by Spang & Company, became converted into the right to receive $20.00 in cash, without interest.

·    ·    ·    ·    ·

the original name of Spang Industries, Inc., and at least 70,950 shares were held by Edgar V. Weir and members of his family. *See* Slip. Op., Kiester, J., 1/6/86, p. 1.

Within thirty days after the Plan of Merger became effective, Industries, in compliance with Section 515 of the Pennsylvania Business Corporation Law, gave written notice to each of the respondents that the merger had become effective on January 31, 1983, and reiterated its offer to pay $20.00 per share for their shares of Industries' stock. Each of these written notices was accompanied by a balance sheet of Industries at October 31, 1982, and a statement of income of Industries for the twelve months ended October 31, 1982.

(Slip. Op., Kiester, J., 11/19/85, pp. 7–10.)

The appellees did not accept the offer; instead, they filed a written objection to the plan of merger prior to January 31, 1983, and a written demand for payment of fair value after January 31, 1983. On November 19, 1986, the trial court issued an adjudication and decision, including findings of fact and conclusions of law. The fair value of Industries' stock was determined to have been $34.50 on January 31, 1983, and interest and expert witness fees were awarded to the dissenting shareholders. Industries filed post-trial motions, and the court issued an amended decision, adjusting the figure for investment value by removing the value it had purported to have taken from expert witness Reed's testimony.

In the amended decision, the trial court determined the fair value of the shares of Industries on January 31, 1983 was $32.76 per share; this fair value materially exceeded the $20 tender offer of Spang. That calculation made was as follows:

## COMPUTATION OF FAIR VALUE

31.   Based on the record, the findings and conclusions the Court has computed the fair value of Industries stock on January 31, 1983 as follows:

|  |  | Weight | Allocation |
|---|---|---|---|
| Market price | 12.50 | 10% | 1.25 |
| Investment value: |  |  |  |
| Hunter 7 × 2.32 = | 16.00 | 10% | 1.60 |
| Net Asset Value: |  |  |  |
| Hunter | 28.00 |  |  |
| Medwig | 41.95 |  |  |
| Reed | 42.23 |  |  |
|  | 112.18 |  |  |
| Average | 37.39 | 80% | 29.91 |
|  |  | 100% | 32.76 |

FAIR VALUE—32 3/4 per share

(Slip Op. at 9.)

The court concluded the refusal of the dissenting shareholders was not arbitrary or vexatious but, rather, was based on the unfairness of the offer.   Judgment was entered on the amended decision on March 3 and, subsequently, Industries brought this timely appeal from both the prior and the amended Orders, questioning the judge's fair value determination and the calculations and methods he used to arrive at the figure.

Both parties agree as to the main Pennsylvania cases which act as guides in appellate review of trial court determinations of fair value of dissenters' shares.   The first of these, *In re Watt & Shand. Appeal of O'Connor*, 444 Pa. 206, 209, 283 A.2d 279, 280 (1971), says:

Our review of this appeal encompasses only an ascertainment of whether the findings of the trial court are supported by competent and substantial evidence.   We reject appellant's request that we make an independent determination as to the fair value of her shares: 'This court does not sit as a trier of issues of fact expecting to be persuaded that one or the other side is more credible. That is only a task for the trial court and we would never invade that area of the judicial process.' (Footnotes and citations omitted).

Following a remand of that case to the trial court for a new fair value determination, it again came before our Supreme Court, *In re Watt & Shand. Appeal of O'Connor*, 452 Pa. 287, 304 A.2d 694 (1973) (*O'Connor Appeal*). At that time, the Supreme Court said:

[T]he object of an appraisal proceeding is to determine the value of the dissenter's shares on a going concern basis. In determining what figure represents this true or intrinsic value, consideration must be given to all factors and elements which reasonably might enter into the fixing of value. As the late Judge Allessandroni wrote in *Austin v. City Stores Co. (No. 1), supra*, [89 Pa. D & C 57 (1953)] at p. 59:

'Some of the factors that must be considered in rendering an intelligent decision are: Asset value; market value; market prices of comparable companies; market price and earnings ratio; management and its policies; earnings; dividends; valuation of assets; reserves for various contingencies; tax liabilities; future earnings; predictions of future business events and etc. The list seems interminable and yet all factors must be considered and given their proper weight in order that a just result might be attained.' (Citations omitted.)

The Court then explained the methods of valuation:

In an attempt to render the unwieldy, wieldable, courts have distilled all of these factors into three principal methods of valuation which have been variably used, commonly in combination, in the actual judicial determination of intrinsic value: (1) net asset value; (2) actual market value, and (3) investment value.

*O'Connor Appeal, supra*, 452 Pa. at 292, 304 A.2d at 697–698 (footnotes omitted).

The Court defined these methods as follows:

*Net Asset Value* is the share which the stock represents in the value of the net assets of the corporation. Such assets include every kind of property and value, whether realty or personalty, tangible or intangible, in-

cluding good will and the corporation's value as a going concern.

*Investment Value* is an estimate of present worth in light of past, present and prospective financial records of the company and is obtained by capitalizing earnings. There are two basic steps in the capitalization process: calculation of a representative annual earnings figure, and choice of a capitalization ratio which reflects the stability and predictability of earnings of the particular corporation.

*Market Value* refers to the price at which the stock was selling on the market prior to the action which is objected to, disregarding any change in price due to the action. (Emphasis in original.)

*Id.*, 452 Pa. at 292–93, n. 7, 304 A.2d at 698, n. 7.

The court admonished:

While net asset value must be given significance, especially in situations where there is no reliable market value for the stock, courts must be extremely judicious with respect to the amount of weight assigned this factor. As one authority has pointed out '[t]here is nearly complete agreement that book value does not accurately represent the fair value of the corporate assets.' This is so for the reason that the balance sheet usually lists assets at original cost, which may differ greatly from present useable value or the present cost of equivalent assets. Normally, the total assets are worth more than the sum of their parts, because they include qualities useful in the context of a particular business that they would lose if put to different uses. In *Borg v. International Silver Co.*, 11 F.2d 147, 152 (2 Cir.1926), the court cautioned, 'The suggestion that the book value of the shares is any measure of their actual value is clearly fallacious. It presupposes, first, that book values can be realized on liquidation, which is practically never the case; and second, that liquidation values are a measure of present values. Everyone knows that the value of shares in a commercial or manufacturing company depends chiefly

on what they will earn, on which balance sheets throw little light.' (Citations omitted.).

*O'Connor Appeal, supra,* 452 Pa. at 296, 304 A.2d at 700.

More recently, in *In re Jones & Laughlin Steel Corp.,* 328 Pa.Super. 442, 477 A.2d 527 (1984), this Court reiterated the standard of review and different valuation methods set forth above. We said:

> While the mandate of O'Connor is that the appraising court *consider* the three methods of valuation, it does not require that after consideration, actual weight be ascribed to any of the valuation methods in attempting to determine a fair value. The goal of fairness would suggest the opposite: i.e., once there has been a determination that a method of evaluation is of no assistance or would be misleading, it should not become a component of the final determination. We note, for example, that in *O'Connor I* the court observed that since the shares of the subject company were not traded on a public market, the market value theory would have no applicability. (Emphasis in original.)

*Id.,* 328 Pa.Superior Ct. at 460, 477 A.2d at 536.

In the case before us, extensive testimony by various experts as to the stock value on January 31, 1983, under all of the above three methods of valuation, was heard by the trial court. We are left to review two contentions of the appellants; the first is whether the judge's calculations included the valuations actually given in the testimony of certain expert witnesses, and the second is whether the judge accorded proper weights to each method on which he based his calculations.

■■■ Appellants contend the judge improperly assigned $28 as the net asset value to which expert witness Hunter had testified, since Hunter had qualified that testimony by saying he felt the realizable net asset value was less than the twenty dollar offer Spang had made. He did, however, testify he had arrived at a figure of $28 and, therefore, the trial judge committed no error in attributing that figure to him (T.T., 3/7/85, pp. 540, 645). We find the court did err

when it assigned a net asset value of $41.95 per share to expert witness Medwig, since the record reflects that the figure to which he testified was $34.62 per share. *See* Defendants' exhibit 22 and T.T. 3/11/85, p. 895.

We believe the court, within its discretion, drew proper conclusions based on the evidence presented. There was more than sufficient evidence to sustain the trial court's conclusion that this was a "squeeze out merger" and that Industries was a dynamic going concern which understated its assets and overstated its liabilities in preparation for the merger. As Industries' stock had been publicly traded, we find the trial judge properly included market value in his valuation considerations. We agree with the trial judge that since Industries owned a majority of the stocks and the stock was lightly traded, it had a "controlling and restrictive" effect on the remaining shares being traded. Thus minimum value should be given to that consideration. As to investment value, because Industries, according to credible evidence produced by the dissenters, had understated assets and overstated liabilities, which reflected adversely on earnings, investment value, while a consideration, was given nominal weight. The most reliable measure, based upon extensive research and expert calculation, appeared to be net asset value, which was given the greatest weight in ascertaining fair value. However, certain inconsistencies require a remand for recomputation of fair value.

First, the allowances of intangibles is not substantiated by the record. At conclusion of law ten, the court relied on a 15–25 per cent standard for intangibles based on I.R.S. standards. This was impermissible in view of the trial court's sustaining an objection to admission of that standard (T.T. 3/8/85, p. 765). Subsequent cross-examination by appellant counsel of Mr. Koetz, dissenter's "intangibles expert", clearly established he had no basis for determining actually which intangibles were allowable, as he was not asked to make that evaluation (T.T. 3/8/85, p. 780).

While intangibles are a factor in computing net asset value, *O'Connor Appeal, supra,* the dissenters have failed to establish how this was determined.

■ Secondly, we believe the trial court was in error in including Mr. Reed's "market value opinion" of $42.23 as a component of net asset value. The heavy weight given to net asset value is because it most closely approximates the true value of the business as a going concern. There is wide division between Industries' and the dissenters' experts on this issue (Hunter and Medwig) but the basis for their evaluation is the same. Mr. Reed (a dissenter's expert) used an entirely different basis which is incompatible to an "averaging" valuation.

As Mr. Reed stated in his report section on Valuation Methods (Appellee's Exhibit 28),

*Market Value Comparison Method*—This method asks the question "At what price have similar companies sold for at similar times?"

*Net Asset Value Method*—This method asks the question "How much would it cost someone to duplicate the company, buy the land, erect the building, buy and install the machinery, train the men, obtain patents, making drawings and get customers?"

He identified thirteen companies similar in nature to Spang and ascertained that they traded at the time of merger at an average of exactly 2.0 book value. Using Medwig's calculations to ascertain book value, he arrived at a book value of $28.09 per share as opposed to Industries reported $19.60. Applying a multiplier of 2.0 to this value, he arrived at a figure of $56.14 (sic) which he acknowledged to be unrealistic. He then ascertained the amount of excess cash held by Industries in proportion to the ratio of cash held by the thirteen comparable companies. Applying the excess cash factor yields a value for Industries of $101,253,-400. Dividing this by the number of shares yields a value of $42.23 per share. This in itself presents a "fair value"

for the shares of Industries, according to Mr. Reed. Therefore, to include it into a computation with net asset value to arrive at fair value skews that computation and makes the final determination invalid. We have no quarrel with the trial court's method of computing fair value and agree that he may consider each of the common methods in combination or separately. Despite appellant's objection, it is precisely the manner in which Mr. Hunter, appellant's witness, arrived at his determination of fair value (T.T. p. 647). It would not be inappropriate to have Mr. Reed's figure included in the overall computation as a fourth factor, but given a separate weight than net asset value, and likely a lower one since it is not as soundly based as it includes greater judgmental factors and fails to consider the asset value reports of Marshall and Stevens relied upon by Medwig.

[8, 9] Excluding Mr. Reed's calculations, and purging the intangibles from the share value attributed to Medwig, the fair value, using Judge Kiester's formula, comes to $27.90 per share. However, while we determine the intangibles may not be considered, we would leave to the trial judge to what extent and proportion the market value comparison figure should be incorporated. In all other respects, we affirm the findings of the trial judge. As to failure to consider the book value, $19.60, the court, within its discretion, may exclude it as being unreliable under the facts of this case. *See O'Connor Appeal* and *In re Jones & Laughlin Steel Corp., supra.* The trial court may reject any factor which he believes to be unreliable.

In summation, we affirm the Order of the trial court in all respects except that the computation of net value shall not include a factor for intangibles. The amount attributed to net value based on Mr. Reed's computation must be excluded from that computation, but may be considered as a separately weighted factor. The case is remanded for adjustment to the Order consistent with this Opinion.

Jurisdiction relinquished.