# Viener v. Jacobs

C.P. of Berks County, no. 00-6385.

*Rees Griffiths* and *David M. Kozloff,* for plaintiff.
*John J. Miravich,* for defendant Jacobs.

SCHAEFFER, *S.J.,* April 24, 2001—

## INTRODUCTION

George P. Viener filed suit against Neal Jacobs, Norman Rush, Michael A. Joffred, Allen Friedman, N.G.N. Inc., Reading Garment Company Inc., Ellmar Manufacturing Inc., Nagan Leasing Inc., Energy Knits Inc., Reading Dyeing and Finishing Inc., Little Creek Mills Inc., LCMA Inc., Amity Finishing Inc. and G.N.K. Partnership for breach of fiduciary duty, wrongful discharge, a shareholder derivative claim and conspiracy.

A non-jury trial was held on liability only and the court filed its adjudication on June 30, 2000. Norman Rush, NGN, RGC, Ellmar, LCMA, and Reading Dyeing have all been adjudicated bankrupt and all proceedings in this action are stayed as to them.

No evidence was presented at the non-jury trial which made Nagan, Energy, Reading Dyeing, Little Creek, Amity or GNK liable to Viener and, therefore, Nagan, Energy, Reading Dyeing, Little Creek, Amity and GNK were dismissed as party defendants.

No evidence was presented at the non-jury trial which made Joffred liable to plaintiff and therefore, Joffred was

dismissed as a defendant. Friedman was dismissed by agreement.

Jacobs was found liable for the breach of his fiduciary duty to minority shareholder Viener and for his outrageous conduct. The issues remaining are to determine: (1) the date as to when the damages should be fixed; (2) the proper value of Viener's shares in NGN and RGC and any related damages; and (3) the appropriate amount of punitive damages that would punish Jacobs for his outrageous conduct. On September 8, 9, 12, 20, and 28, 2000, the court heard the evidence related to these issues in the damages phase of the trial. On April 3, 2001, the court permitted the record to be reopened for rebuttal evidence. In addition to this opinion, we incorporate by reference, and adopt for our reasoning, the adjudication filed in this matter on June 30, 2000. We now enter the following findings of fact:

## II. FINDINGS OF FACT

### Compensatory Damages Valuation Date

(1) In the winter of 1995, the majority shareholders, Jacobs and Rush, froze minority shareholder Viener out of the Subchapter S corporations that he had co-founded.

(2) The appropriate valuation date to determine Viener's interest in NGN and RGC is December 31, 1994.

(3) December 31, 1994 is the most appropriate date for the following reasons:

"(a) Viener was terminated as an officer of NGN and related companies on February 3, 1995;

"(b) After February 3, 1995, Viener had no meaningful role in the management and direction of NGN and its related companies;

"(c) After Viener's termination, company officers made a series of critical decisions which contributed to the failure of the business and in which Viener did not participate, including: (1) a determination to borrow substantial additional monies from local banks; (2) the adoption of annual business plans which called for sales substantially in excess of the company's past experience—plans which were never adjusted to changing market conditions; (3) the adoption of inventory practices, including, but not limited to, the manufacture by Ms. Van Vu and stockpiling of substantial quantities of inventory months in advance of sales; (4) the build-up of an excessive $7 million in inventory; (5) ceasing to take orders for sales of garments; (6) agreeing that an off-shore subsidiary was important to NGN's future success, but allowing such facility to be set up and totally owned by Jacobs and Ms. Van Vu; and (7) electing to close the company's doors despite the fact that the company remained viable. All of the foregoing had a substantial negative impact on NGN's prospects.

"(d) Viener objected strenuously to all the foregoing decisions." (N.T. 270-71, 667, 675-76, 699.)

(4) Many other textile companies, which were well managed during these times of changing economic conditions in the apparel industry, survived.

(5) NGN and its subsidiaries were entities in 1997 and could have continued had they been well managed. (N.T., Joffred, 8/6/99, pp. 610-11.)

(6) Jacobs' problems with the management of the company's production function and his increasing involvement in pursuing his self-interests, setting up a Mexican manufacturing concern for himself and Ms. Van

Vu, resulted in Joffred, then president of NGN, removing Jacobs as head of production.

(7) Rush and Friedman's performance in sales after Viener's removal were a waste of time and money to the company. (N.T., Joffred, 8/5/99, pp. 525-26.)

(8) Viener's participation in annual board meetings in 1995 and 1996 to review NGN's year-end financial statements, and in the July 1997 meeting, were a mere formality.

(9) Shares of NGN and its related entities are not readily marketable and represent illiquid investments. (N.T. pp. 177, 180.)

(10) After Viener was frozen out, he had no opportunity to sell his ownership interests in NGN and RGC to persons other than the majority shareholders, at a reasonable price.

(11) Viener was effectively compelled to retain his ownership interests in these companies while decisions made and actions taken by others effectively destroyed the value of his investment.

(12) The use of a valuation date following Viener's discharge would allow Jacobs to profit from his wrongful conduct.

*Value of Viener's Interest in NGN and RGC*

(13) NGN and RGC had been profitable and had grown substantially during the years Viener was involved in the management and operation of the businesses.

(14) The companies' management expected substantial sales growth in 1995 based on projections from their sales people. (N.T. pp. 674, 676.)

(15) The majority shareholders anticipated that the company would go public in five years and reach $50 million in sales. (Trial exhibit 55, Joffred notes 8/4/94.)

(16) On their own, the owners had informally valued the business at NGN and RGC at two times the book net worth of the two companies; as of December 31, 1994, the book net worth of NGN and RGC was $3.6 million for both companies. (N.T., Viener, 9/8/00, p. 273.)

(17) This value was used by the owners to fix the amount of life insurance coverage which the corporation was required to carry on each owner to protect their interests. (N.T., 9/8/00, p. 273.)

(18) On August 27, 1990, the parties had entered into a written shareholder agreement which required each shareholder to sell his shares for not less than the current book value at the time specified in the offer notice. (Trial exhibit 5.)

(19) The shareholders agreement of August 27, 1990 covered, inter alia, the following situations:

"(a) a shareholder's sale of his shares in the event of his voluntary resignation;

"(b) purchase by the other shareholders in the event of the disability of a shareholder; or

"(c) the purchase of shares in the event of the death of any shareholder."

(20) The shareholder agreement is silent concerning involuntary termination of a shareholder's employment and/or his removal by act of the corporation itself.

(21) The majority shareholders offered to buy Viener out at book value in February and March 1995 immediately after they fired him and froze him out. (Trial exhibits 21, 22, 66 and plaintiff's damages trial exhibit 32.)

(22) At the time the majority shareholders discharged Viener, they expected and anticipated that the companies would have a banner year in 1995.

(23) These Subchapter S companies had produced income attributable to each shareholder which averaged between $300,000 and $375,000 per year in salary and distributions for the period 1990 through 1994; in some years this was up to $450,000. (N.T., 8/11/97, pp. 161, 164.)

(24) As of December 31, 1994, Viener's interest in NGN and RGC was worth $1,835,000. (N.T., Wilusz, 9/7/00, pp. 168-80.)

(25) The expert's valuation, based on tax returns for 1990 through 1994, financial statements and the shareholder agreement, was conservative and took into account the risk that the companies would do less than half as well as management expected. (N.T. 9/7/00, p. 177.)

(26) In 1994, RGC did not operate on a break-even level.

(27) In 1994, each shareholder had a loss of $20,983 resulting from RGC's operations. (Plaintiff's exhibit 15.)

(28) Viener had a 25 percent interest in RGC and a 33 1/3 percent interest in NGN.

(29) The value of shares of stock in closely-held corporations is sometimes discounted to reflect an illiquid minority interest. (N.T., 9/7/00, pp. 180-81.)

(30) It is appropriate in this case to apply a minority shareholder's discount to the value of Viener's shares.

(31) The appropriate discount to be applied to Viener's share is 35 percent.

(32) The defendant presented no evidence as to the value of Viener's shares in NGN and RGC as of December 31, 1994.

360

(33) Applying the 35 percent discount, Viener's shares in NGN and RGC were worth $1.2 million as of December 31, 1994. (N.T., Wilusz, 9/7/00, p. 180.)

(34) Viener's stock in NGN and RGC is now worthless.

(35) Jacobs is liable to Viener for the loss in value of Viener's shares.

*Punitive Damages*

Nature of Jacobs' Conduct

(36) Jacobs has continuously disregarded his fiduciary duties to minority shareholder Viener and subordinated those legal duties to his personal relationship with a woman named Kim Van Vu, who became NGN's largest subcontractor and who is now Jacobs' "partner" in two apparel companies, NV Sportswear and Kimmex.

(37) These two entities make sportswear items which are similar to items made by NGN and which are sold to former NGN customers, Springford Industries and Champion. (N.T. Jacobs, 9/12/00, pp. 460-63, 512.)

(38) Jacobs owns 49 percent of Kimmex. (N.T., Jacobs, 9/8/00, p. 334.)

(39) Jacobs claims he resides with Ms. Van Vu and her family as a "squatter" in Chula Vista, California.

(40) Jacobs and Van Vu work together in NV Sportswear and Kimmex.

(41) NV Sportswear has a facility in Tijuana, Mexico and Kimmex has a facility in Juarez, Mexico. (N.T., Jacobs, 9/8/00, pp. 366-67.)

(42) While Jacobs denies he owns any interest in NV Sportswear, he is paid compensation based upon the company's profits. (N.T., Jacobs, 9/12/00, pp. 464-66.)

(43) Jacobs' efforts to portray himself as dependant on the generosity of Ms. Van Vu for his livelihood are absurd and an attempt to deceive the court.

(44) Joffred resigned as CEO of NGN on August 4, 1997 in part because he no longer trusted Jacobs and Rush. (Adjudication, Schaeffer, June 30, 2000, finding of fact no. 116.)

(45) At about this time, Joffred caused to be prepared a list of equipment transferred to Mexico from NGN's plant. (Plaintiff's damage trial exhibit 29.)

(46) Jacobs sent equipment valued at $15,730, owned by NGN, to Amex and then to Kimmex in Mexico.

(47) Jacobs sent equipment owned by NGN and valued at $196,000 to Amex and then to Kimmex in Mexico.

(48) Jacobs testified that he "paid" for this equipment by reducing the amount NGN owed him. (N.T., Jacobs, 9/12/00, pp. 473-74.)

(49) Jacobs' own personal loan account with NGN showed the money which NGN owed to Jacobs.

(50) Jacobs was not authorized to ship NGN's equipment to Mexico and "pay" for it out of the money he testified NGN owed him.

(51) NGN received no benefit from NGN's assets being shipped to Kimmex. (N.T., 9/20/00, pp. 701-703; adjudication, Schaeffer, 6/30/00, findings of fact no. 98-103.)

(52) Jacobs was unable to explain or reconcile his own personal loan account. (N.T., Jacobs, 9/12/00, p. 479.)

(53) The numbers on Jacobs' account ledger do not equal the amounts of equipment transferred. (N.T., Jacobs, 9/12/00, pp. 476-81.)

(54) Jacobs' personal loan account shows that the company's indebtedness to him was reduced by $79,000 for equipment purchased by NGN and transferred to another Mexican company called Amex; this equipment was then transferred to Kimmex's facility. (N.T., Jacobs, 9/12/00, pp. 477-78, 482; plaintiff's damage trial exhibit 29.)

(55) In addition, Jacobs' personal loan account shows that NGN advanced $122,000 of payroll costs for Amex and that Jacobs' loan account was reduced to "reimburse" NGN for this expenditure. (N.T., Jacobs, 9/12/00, pp. 477-78.)

(56) Jacobs had no corporate authority to use cash from NGN's capital account to pay Amex's payroll costs.

(57) From 1995 onward, Jacobs had full access to all NGN facilities while Viener did not. (N.T., Jacobs, 9/12/00, pp. 435, 437-38.)

(58) From 1997 onward, Jacobs acted as the "manager" of NGN and related entities while the fixed assets and inventory of the companies were being liquidated. (N.T., Jacobs, 9/12/00, pp. 438-40.)

(59) NGN had acquired fixed assets consisting of machinery and equipment which had an original acquisition cost of $4.3 million and which had a book value in excess of $2 million. (N.T., Jacobs, 9/12/00, pp. 443-45.)

(60) While Jacobs "managed" NGN's liquidation after July 1997, Jacobs sold $50,000 of this equipment to a third party and accounted for the proceeds to a secured

creditor, First Union. (N.T., Jacobs, 9/12/00, pp. 438-40.)

(61) Apart from the $50,000 of equipment represented by this secured creditor sale and the above transfers to Kimmex that Joffred attempted to account for before his resignation, Jacobs could not explain where the rest of NGN's equipment went and did not account for any of it. (N.T., Jacobs, 9/12/00, p. 484.)

(62) Jacobs caused NGN to pay Ms. Van Vu money up front to manufacture inventory before it was needed and to keep her factories going 12 months a year, which caused tremendous cash flow problems to NGN. (N.T., Viener, 9/20/00, p. 699.)

(63) When the company's $40 million sales projections were not met, Jacobs did not cut production; the company was then stuck with excessive unsold inventory. (N.T., 9/20/00, p. 675.)

(64) Viener persistently questioned large cash payments to Ms. Van Vu, going back to the May 1994 board meeting where, during said meeting, he was assured by Robert Firely Jr. that payments in cash to Kim NV Inc. were okay since the entity was a corporation. (Liability trial, plaintiff's exhibit 18; N.T., 9/20/00, pp. 653, 656-57.)

(65) Joffred found Ms. Van Vu's relationship with Jacobs to be "suspicious." (N.T., 9/20/00, p. 584.)

(66) The company subsequently prohibited cash payments to subcontractors through a policy adopted by President Joffred. (Adjudication, Schaeffer, 6/30/00, finding of fact no. 55.)

(67) Jacobs then implemented a scheme to continue cash payments to Ms. Van Vu to circumvent the com-

pany policy. (Adjudication, Schaeffer, 6/30/00, findings of fact nos. 60, 62-64.)

(68) Jacobs procured Crown-Globe Inc. a subcontractor of NGN, through its president, Douglas Wolfe, to generate invoices totaling $53,276.59 for "price adjustments" to NGN, but these adjustments were not owed to Crown-Globe Inc. (Adjudication, Schaeffer, 6/30/00, findings of fact nos. 56, 57, 65.)

(69) Jacobs directed Douglas Wolfe to give the money NGN paid Crown-Globe Inc. for these adjustments back to Jacobs so he could continue to pay cash to Kim Van Vu. (Adjudication, Schaeffer, 6/30/00, findings of fact nos. 62-64.)

(70) In January 1995, Jacobs had Crown-Globe Inc. send NGN another round of bogus invoices for $48,135.61, in an attempt to continue cash payments to Ms. Van Vu. (Adjudication, Schaeffer, 6/30/00, findings of fact nos. 69-72.)

(71) While Joffred and Jacobs claim the cash payments to Ms. Van Vu were ultimately properly accounted for, Viener has never been shown records to substantiate that claim. (N.T., 9/20/00, p. 698.)

(72) It is not even clear from NGN's records that the cash payments to Ms. Van Vu were for cheap tee shirts since internal accounting memoranda prepared by Robert Firely Jr., the company controller, indicate that cash payments were for "repairs" and a "marker machine." (N.T., 9/12/00, p. 503.)

(73) Firely was discharged as controller shortly after he attempted to reconcile NGN's accounts with NV Sportswear. (N.T., 9/12/00, pp. 502, 506.)

(74) NGN's accounting firm, Beard & Company, accepted the company's purported "reconciliation" of the cheap tee program only after all owners, except Viener, warranted and represented in writing that the reconciliation was accurate. (N.T., Joffred, 9/20/00, p. 620.)

(75) Viener was afforded an opportunity to review NGN records solely to deprive him of any claim in this litigation that he was deprived of access. (N.T., Joffred, 9/20/00, p. 636.)

(76) NGN gave Jacobs the responsibility to locate off-shore facilities for NGN.

(77) Jacobs, accompanied by Ms. Van Vu, traveled to Mexico and other countries at NGN's expense.

(78) When Jacobs located an acceptable off-shore facility in Mexico, he acquired it for Kimmex, an entity owned by himself and Ms. Van Vu.

(79) Jacobs never gave Viener the opportunity to invest in the off-shore site.

(80) Jacobs never reimbursed NGN for the costs of Jacobs' and Ms. Van Vu's travels as mentioned above.

(81) Jacobs' subordination of his fiduciary duty to his relationship with Ms. Van Vu continued after the freeze-out up to the present.

(82) Jacobs has never expressed remorse or contrition for his bad acts and has made no effort to make amends for them.

(83) Jacobs has responded to the court's findings of liability with an accelerating course of egregious conduct.

*Punitive Damages*

Extent of Victim Viener's Harm

(84) A principal harm caused by the misconduct of Jacobs was the destruction of the total value of Viener's ownership interests in NGN and related entities.

(85) Viener's interests in those entities, fairly valued, and applying the minority discount, was $1.2 million as of December 31, 1994. (N.T., Wilusz, 9/7/00, p. 180.)

(86) The ongoing course of misconduct by Jacobs substantially caused and contributed to the complete destruction of an apparel business which, through successive generations and successor corporations, had involved Viener and other family members for over 50 years.

(87) Viener and each of his partners, Jacobs and Rush, received substantial shareholder distributions and income from their apparel business, exceeding $1 million to each of them in the company's best year. (N.T., Barney, 9/7/00, pp. 69-72; plaintiff's damage trial exhibit 5.)

(88) When Viener was terminated, the business had a substantial stock of equipment and fixed assets ($2,458,443—depreciated book value) and substantial quantities of inventory ($6,411,105) on hand. (Plaintiff's damage exhibits 20, pp. 4, 28.)

(89) By 1997, the value of the company's inventory had increased to $6,429,000. (Trial exhibit 8.)

(90) Jacobs had custody and control of the companies' plant from its closing in 1997 until he was removed and a receiver appointed by this court on August 8, 1999; Viener was completely excluded from access to the facility except during regular business hours when it was

otherwise open, until 2000. (N.T., 9/12/00, pp. 435, 437-38.)

(91) Viener's interest in NGN and the related entities was, in substance, his career and the culmination of his life's work.

(92) At 61 years of age, Viener is too old to start a career in textiles; he now sells off-price, rejected, and other distress apparel and earns $15,000 a year from self-employment. (N.T., 9/8/00, pp. 277-78.)

(93) The shareholders maintained $3 million of whole life insurance on each other's lives to protect their ownership interests in the business if one of them died. (N.T., 9/8/00, pp. 279-80.)

(94) The majority shareholders, without justification and in bad faith, refused to transfer ownership of any of those policies to Viener or permit him to name his family members as beneficiaries. (N.T., 9/8/00, p. 279.)

(95) As a result, Viener was required to apply to the court for special relief to have one of these policies transferred to him so he could pay the premiums to maintain this policy and name his family as beneficiaries. (N.T., 9/8/00, p. 279.)

(96) After Viener was frozen out, he could no longer afford to carry this amount of coverage and it was converted to a $200,000 policy of term life. (N.T., 9/8/00, pp. 279-80.)

(97) Viener also loaned NGN $140,000.

(98) NGN subsequently filed a Chapter 7 bankruptcy.

(99) Viener's indebtedness will be uncollectible as there are no assets for the trustee to administer and nothing will be available for general creditors.

(100) As a result of the freeze-out, Viener has incurred counsel fees in the amount of $240,000. (N.T. 9/20/00, pp. 714-18, 724; plaintiff's damage trial exhibit 38.)

*Punitive Damages*

Wealth of Tort-feasor Jacobs

(101) Jacobs submitted a personal financial statement to the court which purported to show that he had negligible assets and nearly $2.3 million dollars of debt. (Defendant's damage trial exhibit 5.)

(102) Jacobs claims that the only assets he holds individually are worth $500. (N.T., 9/8/00, p. 344.)

(103) This financial statement is false in many respects, and, when taken as a whole, materially misleading; it omitted critical information regarding his ownership interests in bank accounts and investment accounts and greatly exaggerated his obligations.

(104) Jacobs entered this exhibit to convey the impression that he is penniless and deeply in debt.

(105) Jacobs failed to produce any of the financial documents requested in the notice to attend and produce documents that he received for the damages phase of the trial. (N.T., 9/8/00, pp. 364-65, 369.)

(106) Jacobs testified that he has no income and omitted critical information about his sources of income, access to bank accounts, cash and other resources.

(107) Jacobs claimed he had no vehicle other than a 1992 Plymouth Voyager worth $500. (Defendant's damage trial exhibit 5.)

(108) In fact, Jacobs drives a 1995 Lexus on permanent loan to him from NV Sportswear, Ms. Van Vu's company. (N.T., Jacobs, 9/12/00, p. 507.)

(109) Jacobs has access to and can draw upon at least three bank accounts titled in the name of various businesses he is interested in. (N.T., Jacobs, 9/8/00, pp. 368-71.)

(110) Jacobs can draw monies from two Kimmex bank accounts which are in his name—one at Royal Bank in Reading, Pennsylvania and another in Texas. (N.T., Jacobs, 9/12/00, p. 384.)

(111) Jacobs pays all of his credit card bills out of this Kimmex account. (N.T., Jacobs, 9/8/00, p. 377.)

(112) From July 30, 2000, after the court made its liability findings, to September 2000, before the inception of the damages phase of this trial, Jacobs withdrew $59,000 from the Royal Bank account. (N.T., Jacobs, 9/12/00, pp. 388-89.)

(113) Jacobs also has an account at Royal Bank in the name of NFW, a company which owns real estate on which a local restaurant called The Mad Hatter operates; he can also draw on that account. (N.T., p. 370.)

(114) Jacobs also has a bank account at Royal Bank in the name of NKM which owns the land and improvements which Hillcrest Racquet Club operates, which he and Ms. Van Vu founded; the Hillcrest Club employs Jacobs' son, who manages it. (N.T., pp. 370, 390.)

(115) The Hillcrest account has $80,000 in it. (N.T., p. 392.)

(116) Jacobs and Ms. Van Vu each had an interest in 49.5 percent of NKM which is a limited partnership. (N.T., p. 116.)

(117) In order to secure the mortgage to fund the acquisition and construction of Hillcrest, Jacobs and Ms. Van Vu placed a certificate of deposit worth $140,000 at Royal Bank. (N.T., pp. 390-91.)

(118) Jacobs' capital account in NKM was $172,000 as of December 31, 1999. (N.T., Meyer Weiner, 9/7/00, p. 121; plaintiff's damage trial exhibit 13.)

(119) NKM received rental payments from Hillcrest in the amount of $13,000 per month; NKM's balance sheet shows total assets of $1.5 million. (N.T., Meyer Weiner, 9/7/00, p. 121.)

(120) Hillcrest, the operating entity, had total receipts of $438,000 in 1998. (Plaintiff's damage trial exhibit 6.)

(121) Hillcrest obtained substantial additional loans from a local bank in the summer of 2000 to fund further improvements/expansion of the racquet club. (N.T., Jacobs, 9/12/00, pp. 520-22.)

(122) Jacobs personally guaranteed the new Hillcrest loan and pledged his accounts invested by Tom Weik, which are worth $450,000 as collateral. (N.T., pp. 521-22.)

(123) In order to obtain the loan, Jacobs provided a financial statement to the lender that he admits was "different" from the one he provided to this court. (N.T., p. 522.)

(124) Written evidence was produced which purported to show that Jacobs had transferred his ownership in NKM to Ms. Van Vu, in a recent transaction, for $90,000; $30,000 of the purchase price was represented by forgiveness of an alleged debt owed to Ms. Van Vu and $60,000 allegedly paid by Ms. Van Vu to Jacobs. (Plaintiff's damage trial exhibit 19.)

(125) No pre-existing debt to Ms. Van Vu existed.

(126) Moreover, Jacobs immediately endorsed the checks paid by Ms. Van Vu, totaling $60,000, back to her; Jacobs received nothing of value for his interests in the real estate, improvements and liquid assets owned by NKM. (N.T., Jacobs, 9/12/00, pp. 528-30.)

(127) Jacobs never advised his accountant that he had "sold" his interest in NKM to Ms. Van Vu until August 28, 2000, immediately before the damage phase of this trial was to begin. (N.T., Meyer Weiner, 9/7/00, p. 118.) In fact, the conveyance was a fraudulent conveyance made for the purpose of putting these assets beyond the reach of his creditors, including the plaintiff.

(128) Jacobs also claims to have transferred his one-half ownership interest in Hillcrest Racquet Club to his son, Matt, in August 1995, for no consideration; he never told his accountant that he had made this gift or reported it to the IRS. (N.T., pp. 98-102.)

(129) Jacobs' tax returns after 1995 impute Hillcrest earnings and loss to Jacobs and his wife. (N.T., p. 103.)

(130) Jacobs did not in fact transfer his interest in Hillcrest Racquet Club to his son or anyone else in 1995 or at any other time.

(131) Jacobs has not disclosed any information to his accountant regarding his income and expenses for 1999; and extension for his personal tax return of 1999 was obtained until October 15, after the date of the damages phase of this trial. (N.T., Meyer Weiner, 9/7/00, p. 134.)

(132) Jacobs is entitled to receive $225,000 in tax refunds on account of the failure of NGN; but Jacobs failed to disclose his entitlement to these refunds as an asset on

the financial statement he provided to the court. (N.T., p. 134; defendant's damage trial exhibit 5.)

(133) Jacobs earned substantial income following the collapse of NGN that he did not voluntarily disclose: in 1995, he earned $156,000 from NGN, $46,500 in interest, $86,100 in dividends and had a $43,000 capital gain; he paid no income tax because of NGN losses; Jacobs' wife nets about $40,000 as a schoolteacher. (Plaintiff's damages trial exhibit 15; N.T., Jacobs, 9/12/00, p. 422.)

(134) Jacobs received $180,000 from NV Sportswear and Kimmex in 1997. (N.T., Meyer Weiner, 9/7/00, p. 142.)

(135) Although Jacobs' financial statement shows Kimmex to be worthless, he claims to have supplied over $200,000 worth of equipment, that he claims to own personally, to Kimmex. (Adjudication, Schaeffer, 6/30/00, findings of fact nos. 95-100.)

(136) Jacobs refused to say that he had ever seen Kimmex's books, which he claims Ms. Van Vu keeps in Mexico. (N.T., Jacobs, 9/12/00, pp. 448-49, 535.)

(137) Despite this, Jacobs admits Kimmex had estimated gross sales of at least $700,000 in 1998 and 1999. (N.T., pp. 449-52.)

(138) Although Kimmex is a Subchapter S corporation organized in Pennsylvania, it has not filed state or federal tax returns; Kimmex never provided Jacobs with a K-1 showing his share of the profits as an owner of Kimmex. (N.T., Jacobs, 9/12/00, pp. 448-54.)

(139) Jacobs tax returns for 1996 and 1997 are inaccurate.

(140) Because Kimmex records are in Mexico and Jacobs has not been forthcoming about his involvement

with NV Sportswear, the court does not have complete or accurate information regarding Jacobs' net worth.

(141) Jacobs failed to honor the subpoena duces tecum served upon him by not bringing the statements, for the period of January 1, 1998 to the present, of all bank or financial accounts on which he is named, dated within the last year, including, but not limited to, checking account statements, savings account statements, certificates of deposit, money market accounts, statements or other documents which show his ownership interest in stocks, bonds, mutual funds, brokerage accounts or other similar accounts and/or investments. (N.T., Jacobs, 9/8/00, p. 365.)

(142) Jacobs has willfully concealed the nature and extent of his interest and involvement in NV and Kimmex.

(143) Jacobs also failed to disclose his ownership interests in several significant brokerage accounts managed by Tom Wiek.

(144) Jacobs and his wife had a combined net worth of $4 million in 1993. (N.T., Weik, 9/7/00, p. 30.)

(145) Jacobs and his wife own an account invested with Investors Trust which has a value of $159,000 and an account with Penn Security having a value of $337,600. (N.T., pp. 33-34.)

(146) Jacobs owns a rollover IRA which has $955,614 in it that Mr. Weik manages for him. (N.T., p. 42.)

(147) Jacobs and his wife have purchased investments managed by H & P Management LLP and Republic Bank of Korea for approximately $160,000 (N.T., pp. 33-34.)

(148) Jacobs also has a rollover IRA invested by Shearson which has a value of approximately $80,000. (N.T., p. 402.)

(149) Jacobs failed to disclose that he holds a mortgage on the property owned by Greshville Realty in the amount of $135,000 which generates an income of $2,000 per month. (N.T., Jacobs, 9/12/00, pp. 410-11.)

(150) Jacobs first claimed the monthly payments on the Greshville mortgage were used to pay the mortgage on Jacobs' residence; Jacobs later changed his position and claimed other funds from Greshville Inn were used to pay his home mortgage. (N.T., pp. 410-13.)

(151) Jacobs acknowledged he and his wife advanced $300,000 of their own assets to acquire the Greshville Inn, its liquor license and to improve the facility. (N.T., pp. 508-509.)

(152) While Jacobs claims to have "assigned" all of his interests in the Greshville Inn to his wife as security for repayment of the purchase, he provided no extrinsic evidence, such as an assignment of mortgage payments, to corroborate that claim.

(153) Jacobs did not assign said interests to his wife or anyone else.

(154) In 1997, Jacobs acquired all of the shares of NFW Corp., which owns the building where The Mad Hatter restaurant and several apartments are located, from the co-owners, the Monteiths, and forgave certain indebtedness owed to him in exchange for these interests. (N.T., p. 513.)

(155) Although Jacobs claims to have gifted The Mad Hatter to his son, Matt, in 1997, he offered no extrinsic evidence to corroborate that claim; there is no evidence

that such a gift was reported to the IRS or a gift tax paid; there is also no evidence in the tax returns Veiner provided that such a gift occurred. (N.T., p. 513.) In fact, Jacobs did not gift The Mad Hatter to his son.

(156) Jacobs invested $90,000 in improving the building where The Mad Hatter is located; from apartment and restaurant rentals, NFW generates rentals of approximately $2,400 per month. (N.T., pp. 514, 516.)

(157) Jacobs valued the Greshville property and The Mad Hatter property at zero on his personal financial statement.

(158) When Jacobs is not "squatting" at Ms. Van Vu's house in California, he and his wife reside in a Berks County residence last valued at $650,000 in 1997 and owned by them as tenants by the entireties. (N.T., p. 419.)

(159) Jacobs claimed to owe Frank McCullough (the purchaser of the First Union secured debt) $1.3 million on his personal financial statement when Jacobs knew that McCullough had offered to settle with him for between $125,000 and $150,000 and that McCullough "would be happy with" a number in that range. (N.T., pp. 432-33.)

(160) Jacobs claimed to owe Bank of New York $375,000 or more when he knew that one of his co-partners, Allen Friedman, would be required to pay that debt. (N.T., pp. 495-97.) Said debt has now been paid. (Plaintiff's exhibit 43A.)

(161) Jacobs owes $163,773.19 for legal fees and disbursements arising out of the litigation over the Bank of New York debt, jointly and severally, with Allen Friedman and Riki Friedman. (Defendant's exhibit 16.)

(162) Jacobs' continued refusal to admit or acknowledge satisfaction of the Bank of New York obligation forced plaintiff to conduct a deposition by written interrogatories of Friedman where he confirmed satisfaction of that debt and payment of counsel fees; the total payment by Friedman was $420,000. (Plaintiff's damage trial exhibit 39, pp. 4-5.)

(163) Jacobs' statement of assets and liabilities fails to acknowledge that he breached his duties to Viener or accept responsibility to pay anything to Viener. Jacobs does not acknowledge even the existence of an unliquidated debt to Viener.

## III. DISCUSSION

### Compensatory Damages

We have found that, in the winter of 1995, the majority shareholders, Jacobs and Rush, froze minority shareholder Viener out of the Subchapter S corporations that Viener had co-founded and breached their fiduciary duty to protect his interests. We find that the appropriate valuation date to determine Viener's interest in NGN and RGC is December 31, 1994 for the following reasons:

"(a) Viener was terminated as an officer of NGN and related companies on February 3, 1995;

"(b) After February 3, 1995, Viener had no meaningful role in the management and direction of NGN and its related companies;

"(c) After Viener's termination, company officers made a series of critical decisions which contributed to the failure of the business and in which Viener did not have

meaningful participation, including: (1) a determination to borrow substantial additional monies from local banks; (2) the adoption of annual business plans which called for sales substantially in excess of the company's past experience—plans which were never adjusted to changing market conditions; (3) the adoption of inventory practices, including but not limited to the manufacture by Ms. Van Vu and stockpiling of substantial quantities of inventory months in advance of sales; (4) the build-up of an excessive $7 million in inventory; (5) ceasing to take orders for sales of garments; (6) agreeing that an off-shore subsidiary was important to NGN's future success, but permitting said facility to be set up as owned by Jacobs and Van Vu; (7) electing to close the company's doors despite the fact that the company remained viable."

All of the foregoing had substantial negative impact on NGN's prospects. Viener objected strenuously to all these decisions.

NGN and its subsidiaries were viable entities in 1997 and could have continued had they been well managed. Many other textile companies survived because they were well managed during these times of changing economic conditions in the apparel industry. But Jacobs' problems with the management of the company's production function and his increasing involvement in pursuing his self-interests, including, but not limited to setting up a Mexican manufacturing concern for himself and Ms. Van Vu, resulted in his removal as head of production. Rush and Friedman's performances in sales after Viener's removal were a waste of time and money to the company.

Shares of NGN and its related entities are not readily marketable and represent illiquid investments. After

Viener was frozen out, he could not market his owner-ship interest in NGN to persons other than the majority shareholders for a price reasonably near its actual value. Viener, therefore, was effectively compelled to retain his ownership interests in these companies while decisions being made and actions being taken by others effectively destroyed the value of his investment. We find that the use of a valuation date following Viener's discharge would allow Jacobs to profit from his self-serving con-duct.

What remains to be determined is valuation of Vien-er's interests in NGN and RGC as of December 31, 1994. Defendant proposes that Viener should be paid book value over five years, pursuant to the shareholder agree-ment, as of 1996. (Jacobs' proposed findings of fact and conclusions of law, nos. 126-27, 130-32.) We disagree.

On August 27, 1990, the parties had entered into a written shareholder agreement which guaranteed each shareholder that he could sell his shares at the then cur-rent book value of the companies. In February and March 1995, immediately after they fired Viener and froze him out, the majority shareholders offered to buy Viener out at book value over five years. Viener refused to sell his shares for book value because this did not represent the fair value of his interest. The shareholders had consid-ered the fair value of their interests to be two times the book net worth.

"[W]hen a contract fails to provide for a specific con-tingency, it is silent, not ambiguous." *Seven Springs Farm Inc. v. Croker,* 748 A.2d 740, 744 (Pa. Super. 2000). (ci-tation omitted) When unambiguous, the court must in-terpret its meaning solely from the contents within its

four corners, consistent with its plainly expressed intent. *Id.* The agreement entered into by Viener, Jacobs and Rush covered:

"(a) a shareholder's transfer, pledge, or sale of his shares in the event of his voluntary resignation, and the right of first offer to the other shareholders;

"(b) purchase by the other shareholders in the event of the disability of a shareholder; or

"(c) the purchase of shares in the event of the death of any shareholder."

The agreement does not address involuntary termination of a shareholder's employment and/or his removal as a director. The primary purpose of the agreement is to provide for continuity in the management of the business and affairs of the corporations by restricting the sale or transfer of stock by individual shareholders. The parties to the agreement either intended to exclude the sale of the shares upon termination of employment or did not anticipate or consider such an event, which is the more likely scenario. The parties in this case are not unsophisticated; they are familiar with corporate formalities and had legal advice in drafting the agreement. We find that the agreement is clear and unambiguous and shall be strictly construed. The silence of the agreement regarding these circumstances is conspicuous; they are not expressly listed events. We find, therefore, that the agreement does not apply to the factual scenario presented by this case.

We will order defendant Jacobs to pay Viener the fair value of Viener's interests in NGN and RGC as of December 31, 1994. In *O'Connor Appeal,* 452 Pa. 287, 304 A.2d 694 (1973), our Supreme Court explained that in

determining the fair value of a minority holder's stock, "consideration must be given to all factors and elements which reasonably might enter into the fixing of value." *Id.* at 292, 304 A.2d at 698. The Supreme Court instructed that "fair value" is determined based upon the value of the shares on a going concern basis to arrive at the true or intrinsic value. *Id.* at 292, 304 A.2d at 697-98. In the actual judicial determination of intrinsic value, various factors have been distilled into three principal methods of valuation which have variably been used, commonly in combination with each other: (1) net asset value; (2) actual market value; and (3) investment value. *Id.* However, the court is not limited to a consideration of only these three valuation methods. *In re Glosser Brothers Inc.,* 382 Pa. Super. 177, 186, 555 A.2d 129, 133 (1989). In *O'Connor,* the Supreme Court found that although market value may generally be relevant, the market value of the stock in that case had no application whatsoever because the company was a closely-held corporation having unlisted stock and therefore no public market. *Id.* at 292 n.6, 304 A.2d at 698 n.6. Such is the case sub judice and under the facts presented, market value has no relevance and we shall not consider it.

Defendant has not offered any expert testimony on the valuation of Viener's interests. Plaintiff offered the expert testimony of Edward Wilusz, a certified financial analyst and the president of Value Management Inc., a consulting firm specializing in business valuations. Mr. Wilusz has been involved in the valuation business since 1980 and currently does about 200 appraisals a year for tax related purposes, employee stock ownership plans, litigation support and to provide assistance to buyers and

sellers of businesses and business interests. Most of his work has been in the area of closely-held corporations. We accepted Mr. Wilusz as an expert in valuing business interests and we accord his opinion substantial weight.

Mr. Wilusz reviewed, inter alia, tax returns for NGN for the years 1990 through 1994, the August 27, 1990 shareholder agreement, and NGN and RGC's combined financial statement for 1994. His appraisal process was broken into three separate stages: (1) data gathering on the company itself, looking at what is going on in the industry and industry expectations and then making a comparison; (2) taking all of that information for the company and the industry and making some sense of it; and (3) applying three various approaches to value: asset value (assets minus liabilities), comparative company or guideline company approach (which looks at companies with similar investment characteristics as the subject company), and the present value of future earnings approach.

Under the asset value approach, the company had a value of $3.6 million as of December 31, 1994. This approach is given little weight unless a liquidation is anticipated or expected in the not too distant future.

Under the comparative company or guideline company approach, the expert examined 85 apparel companies and narrowed it down to 10 that shared similar investment characteristics with NGN. He then examined their performances, compared these to the subject company and arrived at a multiple that was applied to the subject company. He looked at price-to-average earning multiples with pricings to a five-year average multiple. The price-to-average earning multiple of the guideline companies was relatively high, 25 times. The expert applied a low

multiple of nine times to the subject companies' earnings. The price-to-earnings multiple was 17 times for the guideline companies; he used an evaluation multiple of 13 times for the subject company in that case. The valuation under this approach was $6 million.

Under the last approach, present value of future earnings, Wilusz first looked at the past average earnings of the company to get an idea of the future. The number he then used was over 50 percent less than what the majority shareholders said they were going to achieve in 1995. Then he brought this number back to present value by taking into account the risk that the company would not do a little more than half as well as management expected. This was done by applying a discount rate of 21 percent to arrive at a valuation conclusion of $5.5 million. A one-third interest is $1.835 million.

Further applying a minority shareholder's discount of 35 percent to this figure, the expert opined, with a reasonable degree of professional certainty, that the value of Viener's interest in the subject company, as of December 31, 1994 came to $1.2 million.

We find that the present value of future earnings approach is the most reliable method to assess the fair value of Viener's interests. We hold, therefore, that the fair value of Viener's interests in NGN and RGC as of December 31, 1994 is $1.2 million and we shall award him said amount.

### Punitive Damages

In our adjudication of June 30, 2000, we found that Jacobs' conduct was outrageous and this finding makes him liable for punitive damages.

The Supreme Court of Pennsylvania adopted section 908(2) of the Restatement (Second) of Torts in *Feld v. Merriam,* 506 Pa. 383, 485 A.2d 742 (1984). Section 908(1) states that punitive damages are damages "awarded against a person to punish him for his outrageous conduct." Punitive damages need not be proportional to compensatory damages. In assessing punitive damages, the trier of fact may consider the character of the tort-feasor's act, the nature and extent of his victim's harm, and the wealth of the tort-feasor. *Kirkbride v. Lisbon Contractors Inc.,* 521 Pa. 97, 100, 555 A.2d 800, 802 (1989). It is for the fact-finder to weigh these factors in arriving at an appropriate punitive damage award.

We must weight the conduct of the tort-feasor against the amount of damages which would deter such future conduct. In performing this duty, we must weigh the intended harm against the tort-feasor's wealth. *Id.* at 102, 555 A.2d at 803.

Jacobs breached his fiduciary duty of loyalty and fairness to minority shareholder Viener. He promoted his self-interests with his business associate, Ms. Van Vu, at the expense of the minority shareholder. He misused his power by promoting his personal interests at the expense of the corporate interests by, inter alia, creating fraudulent schemes to circumvent company policy. This conduct is wantonly tortious, despite the fact that the books were later "reconciled" to justify it. Jacobs cannot explain the loss of significant amounts of NGN equipment even though he "managed" NGN's liquidation.

He reduced the company's working capital, at a time when it was short on cash, to pursue his own interests in Mexico. He converted NGN's equipment. Jacobs failed

to use his best efforts to procure the continued existence of NGN. All of this came at the expense of NGN and of Viener, whose own interest in the company became worthless after Jacobs' failure to protect it. Viener has been denied his proper share of the benefits accruing from the company.

There are few remedies available for minority shareholders in closely-held corporations under these circumstances. They are particularly vulnerable to the majority who can destroy their interests with impunity by trying to hide behind the business judgment rule. Such harm must be punished and, thus, deterred. We will impose punitive damages in a reasonable amount to punish Jacobs for his self-dealing and outrageous conduct which was a breach of his duty of loyalty to Viener. Furthermore, Jacobs has deliberately misrepresented his net worth to this court. In fact, Jacobs thumbed his nose at the court with his testimony. He testified that he had an old automobile worth $500 and nothing more. He testified that his daily living expenses were paid by his associate, Ms. Van Vu, that she gave him his lunch money, and that she provided him with a place to stay, her house in California, for nothing, apparently out of the goodness of her heart.

Jacobs testified that he owned nothing but the car, that his 49 percent interest in Kimmex was valueless. He asserted his interests in the tennis club, the Greshville Inn and The Mad Hatter were valueless. He skipped completely over his IRA account and its value and his other investments. He was, according to him, all but destitute and penniless.

We cannot find the exact measure of Jacobs' wealth because he lied to the court about his wealth and attempted to conceal it. He stone-walled plaintiff's efforts to obtain information about it. He refused to appear for depositions after this court had determined that he was liable for punitive damages and before the damage phase of this trial began, by which means plaintiff sought to ascertain Jacobs' net worth. He refused to honor the subpoena duces tecum served upon him requiring him to bring certain information to trial.

The evidence presented at trial established that Jacobs has substantial assets available to him. Jacobs can draw upon the following accounts:

(1) The Kimmex accounts with the

(a) Royal Bank in Reading, Pennsylvania;

(b) Royal Bank in Texas;

(2) The NFW account with the Royal Bank in Reading;

(3) The NKM account with the Royal Bank in Reading;

(4) Certificate of deposit for $140,000 held by Jacobs and Ms. Van Vu in the Royal Bank in Reading;

(5) Capital account in the name of NKM for $172,000.

(6) Jacobs had a 1/2 interest in the Hillcrest Racquet Club which we find he still retains.

(7) Jacobs has expected incoming funds of $225,000 for an income tax refund.

(8) In 1995, Jacobs received $156,000 as income from NGN, interest of $46,500, dividends of $86,100, and a capital gain of $43,000.

(9) In 1997, Jacobs received $180,000 income from NV Sportswear and Kimmex.

(10) Jacobs and his wife receive $2,000 per month on the mortgage they hold on the Greshville Inn.

(11) Jacobs receives $2,400 per month from NFW rentals.

(12) Jacobs, through NKM, received rental payments from Hillcrest in the amount of $13,000 per month. NKM has total assets of $1.5 million. Hillcrest, the operating entity of NKM, had total receipts of $438,000 in 1998.

(13) Jacobs pledged accounts worth $450,000 as collateral for a loan for Hillcrest in the summer of 2000.

(14) Jacobs had an ownership interest in NKM for $90,000 which we find he still retains.

(15) Jacobs and his wife have the following joint property:

(a) $159,000 with Investor's Trust;

(b) $337,600 with Penn Securities;

(c) $160,000 with H & P Management LLP and Republic Bank of Korea.

(16) Jacobs alone owns two rollover IRAs, the first worth $955,614, managed by Mr. Tom Weik, and the second invested by Shearson and worth $80,000.

(17) Jacobs and his wife paid $300,000 to acquire the Greshville Inn and its liquor license, which they still own.

(18) Jacobs owns the NFW Corporation, which owns the building where The Mad Hatter restaurant and several apartments are located.

(19) Jacobs and his wife own their principal residence, which was worth $650,000 in 1997.

Jacobs owes debts as follows:

(1) To Frank McCullough, purchaser of the First Union secured debt, in the amount of $125,000;

(2) Legal fees of $163,733.19 for litigation with the Bank of New York.

We turn our attention to the above assets, not because they are subject to, or immune from, Jacobs' creditors, and not because they are owned solely by him, or by him and others, but because they show the monies that he uses and has access to, and, therefore, such assets are a part of the assets which this court can, and will, consider in fixing an appropriate sum for punitive damages.

This court will not permit Jacobs' mendacity, his outright lies, his refusal to honor this court's subpoenas, to now be turned to his benefit, and while we cannot ascertain his precise net worth, we are satisfied that his various business interests, including his arrangements with Ms. Van Vu, give him access to substantial assets. In determining punitive damages, evidence of net worth is not mandatory. *Shiner v. Moriarty,* 706 A.2d 1228, 1240 (Pa. Super. 1998). To the extent that it is relevant, we find that the evidence presented on Jacobs' net worth provides us with a sufficient basis to determine the amount of punitive damages appropriate to Jacobs' means. A punitive damage award of $1 million, based on all the factors which we are allowed to consider in arriving at a punitive damage award, is reasonable and proper in this case.

## IV. CONCLUSIONS OF LAW

(1) Jacobs' pursuits of his self-interests at the expense of the minority shareholder's interests were a breach of Jacobs' fiduciary duty to Viener.

(2) Jacobs' covert diversion of NGN's cash, equipment, machinery and financial resources for his own self-interests caused or contributed to the destruction of Viener's interests in the profitable apparel businesses founded or capitalized by Viener's family.

(3) Viener is entitled to relief as a result of a systematic freeze-out implemented by majority shareholders Jacobs and Rush.

(4) December 31, 1994 is the applicable valuation date to determine the value of Viener's interests in NGN and RGC.

(5) The shareholder agreement is inapplicable in determining the value of Viener's interests under the facts of this case.

(6) Expert Edward Wilusz' application of conventional valuation techniques to four prior years income for NGN and combined financial statements of NGN and RGC was sufficient to estimate the value of NGN and RGC as of December 31, 1994.

(7) Applying the 35 percent discount to Viener's ownership interests adequately takes into account the illiquidity of the minority shares, the adversarial atmosphere of the proceedings, any known and unknown contingencies as of December 31, 1994, any impact which could result from Friedman's 25 percent ownership interest in RGC as well as any negative impact losses from RGC would have on the valuation of Viener's interest in NGN.

(8) Accordingly, Viener is awarded $1.2 million in compensatory damages, reflecting the discounted value of his ownership interest in NGN and RGC as of December 31, 1994.

(9) The nature of the conduct of Jacobs in creating fraudulent schemes to circumvent company policy is outrageous.

(10) The nature of the conduct of Jacobs in diverting NGN's cash, equipment, machinery and financial resources to Ms. Van Vu and the offshore facility they own together is outrageous.

(11) The harm caused to Viener is significant because he has lost his financial interest in these businesses, the family business itself, and has incurred substantial legal bills and other debts.

(12) Punitive damages are appropriate to punish Jacobs for his outrageous conduct.

(13) Jacobs has structured his financial affairs to limit the award of punitive damages to little or nothing.

(14) Jacobs is a wealthy man with access to assets worth over $4 million.

(15) The court will not be deterred from fixing an appropriate punishment because Jacobs refused to fully disclose his current net worth, income and prospects.

(16) An award of punitive damages is necessary to punish Jacobs for his conduct and to deter others from engaging in like conduct.

(17) An award of $1 million is adequate punishment in this case. Accordingly, we enter the following decree nisi:

## DECREE NISI

And now, April 24, 2001, after a non-jury trial on damages, and in consideration of the foregoing opinion, the court enters an award in the amount of $1.2 million in

favor of the plaintiff, George Viener, and against the defendant, Neal Jacobs, for breach of fiduciary duty, and a constructive trust is imposed upon Neal Jacobs for this amount.

It is further ordered that punitive damages in the amount of $1 million are awarded in favor of the plaintiff, George Viener, and against the defendant, Neal Jacobs, to punish and deter Jacobs for his outrageous conduct.

Unless post-trial motions are filed to the decree nisi within 10 days from and after the date of service of said decree upon the parties, the decree nisi shall become absolute as of course.